(562 P.2d 453)

No. 48,307

GAROLD E. SHELMAN and CAPITOL STORES, INC., a corporation; and HARTFORD ACCIDENT AND INDEMNITY COMPANY; R. G. ALDRIDGE d/b/a ALDRIDGE CONSTRUCTION COMPANY, and UNITED STATES FIDELITY AND GUARANTY COMPANY, *Appellees,* v. WESTERN CASUALTY AND SURETY COMPANY, *Appellant.*

Petition for review denied April 18, 1977.

Opinion filed March 4, 1977.

*Wayne T. Stratton* and *Harold S. Youngentob*, of Goodell, Casey, Briman and Cogswell, of Topeka, for the appellant.

*Robert B. Wareheim*, of McCullough, Wareheim and LaBunker, of Topeka, and *Carl W. Quarnstrom*, of Shaw, Hergenreter, Quarnstrom and Wright, of Topeka, for the appellees.

FOTH, J.: Plaintiff Garold E. Shelman, having obtained a $50,000 judgment for personal injuries alleged to have been sustained at the hands of the Al Elam Construction Company, Inc., sought to collect his judgment on behalf of himself and the other plaintiffs claiming through him by this suit against Elam's general liability underwriter, Western Casualty and Surety Company. (The claim of the other plaintiffs arises out of workmen's compensation benefits paid to Shelman.) The primary issue is whether Western's comprehensive liability insurance policy covered the incident in which Shelman was injured, or whether the incident came within an exclusionary clause of the policy. By stipulation the case was submitted to the trial court on depositions, exhibits, briefs and oral argument. It found coverage and rendered judgment against Western for $25,000, the limit of its policy. Western has appealed.

The facts, as found by the trial court, are not disputed.

In June, 1966, R. G. Aldridge, d/b/a the Aldridge Construction Co. (one of the plaintiffs), was engaged in building a highway bridge across the Osage River in Missouri, just below Bagnell Dam. It needed to move its equipment to the opposite bank, but the size of the equipment precluded its being transported by highway. Aldridge therefore engaged Elam, the insured here, to ferry the equipment across on a barge. Elam was basically a sand and gravel dredging operation, and had never performed such work before. It nevertheless agreed to furnish its barge, its stern-wheeler tug "Popeye," and a captain and a deckhand (Albert Ash) to operate them. Aldridge was to be responsible for loading and unloading his equipment.

Shelman, the injured plaintiff, was an employee of Capitol Stores, Inc., of Topeka, and was in charge of maintaining the tires on Aldridge's equipment. On this occasion he was present to protect the tires during the move.

The trial court's findings narrate the manner in which the accident occurred:

"11. Elam's phase of the aforementioned ferrying operation, aside from the actual transportation, was to stabilize the barge at the riverbank, by means of the tugboat's power and by means of two steel cables ⅝ inches in diameter, one of which was attached to each bank-end corner of the Elam barge, the other ends of which were attached each to a piece of Aldridge's heavy earthmoving equipment parked on the riverbank; Aldridge's mechanic would then back the piece of Aldridge's heavy equipment which it was intended to move across the river at the time, across a dirt ramp built by another of Aldridge's men and onto the barge, after which the lines at the barge end of the operation were cast off, and the ferrying operation would proceed; the ties, or fastenings, of the cables to the barge were made by Elam's deckhand, who employed a number of figure 8 loops around a caveness or cavel (a metal horn) on the barge. As the operation progressed, personnel other than the deckhand assisted in the tying. The ends of the cables attached to the bulldozers remained in place. So the tying and untying on each trip occurred only on the barge end.

"12. During the action (sic—actual) loading stabilization of the barge was of key importance. The stabilization was accomplished by virtue of the cables which had to be taut and the pushing of the barge against the bank by the tug under power. The bulldozers were moved on each loading to insure taut cables. The tug alone had insufficient power to stabilize the barge while the equipment was being loaded. The cables alone, were insufficient. It took both cables and the tug power to stabilize. Throughout the day different volumes of water were discharged out of Bagnell Dam into the river. This changed the level of the river sufficiently that troubles were encountered in keeping the cables taut and in keeping the dirt ramp adequate for the loading.

"13. Four or five loadings and trips across the river were made uneventfully.

"14. The next loading was to occur around noon. Aldridge did not have another piece of equipment in place to load when the tug returned. The deckhand went forward to eat lunch. The loading commenced. As the equipment was being loaded the cable came loose from the upstream end of the barge. The barge swung downstream. The equipment being loaded turned over, severely injuring plaintiff Shelman.

"15. Al Elam employees had complete control over the barge and tug. No one else directed or controlled the operation of same. The accident occurred on the barge, which was on the river, and was a result of the cable on the barge coming loose. There is a question as to who actually tied the cable in question. It could have been Ash or an Aldridge employee. The Aldridge employees did tie some cables during the day—but they were copying the figure eight knots used by Ash initially."

Western was notified of the accident, which occurred June 15, 1966. It investigated and on January 31, 1967, wrote its insured, Elam, that it was denying coverage. Thereafter several abortive suits were filed against Elam; finally, on May 19, 1971, one resulted in the judgment which supplies the basis for this suit.

That suit was brought by all plaintiffs against Elam in the

United States District Court for the Western District of Missouri. Western was notified of the suit but refused to defend. Elam, through its own counsel, filed an answer in which it raised a number of defenses. It also asserted a counterclaim against Aldridge for indemnity, claiming Aldridge had contracted to assume all responsibility for the ferrying operation and for all injuries or damages arising out of it.

Negotiations between the parties resulted in a stipulation of settlement of a character specifically authorized by Missouri statute (R. S. Mo. 1976 Supp. § 537.065). Under its terms Elam paid to the plaintiffs $10.00, dismissed its counterclaim, and consented to trial without further notice to it. In return, plaintiffs agreed that if they obtained a judgment against Elam it would not be a lien against Elam's property and they would not seek to execute except against any insurer whose policy covered Elam's liability for such damages.

The federal court approved the stipulation and proceeded to hear the case without a jury. It found from the evidence presented that the upstream end of the barge came loose as a direct result of the negligence of Elam's employees, causing Shelman's injuries. It awarded plaintiffs judgment, as their interest might appear, in the amount of $50,000. This suit followed.

Western's basis for denying coverage and the foundation for its defense in this action is the so-called "watercraft exclusion" clause in the policy it issued to Elam:

"This policy does not apply:

. . . .

. . . .

.

"(c) under coverages A and C, except with respect to operations performed by independent contractors and except with respect to liability assumed by the insured under a contract as defined herein, to the ownership, maintenance, operation, use, loading or unloading of (1) watercraft twenty-six feet or more in overall length and not specifically described in the declarations of the policy, if the accident or occurrence takes place away from premises owned by, rented to or controlled by the named insured, or (2) aircraft. . . ."

By separate endorsement it was provided:

"EXCLUSION OF WATERCRAFT. It is agreed the policy does not apply under Coverages A and C, except with respect to operations performed by independent contractors and except with respect to liability assumed by the insured under a contract covered by the policy, to the ownership, maintenance, operation, use, loading or

unloading of watercraft if the accident occurs away from premises owned by, rented to or controlled by the named insured."

The applicability of the exclusionary clause was first presented to the trial court here by Western's motion for summary judgment. It was undisputed that the place where the accident happened was not "owned by" or "rented to" Elam. The issue therefore was whether it could be said to be "premises . . . controlled by" Elam. We cannot improve upon the trial court's analysis:

"If there is any material issue of fact, which, if resolved in the plaintiffs' favor, would permit recovery, then summary judgment can not be granted. Thus, if a case can be made that Elam either controlled the premises where the accident occurred or contracted to assume liability for the accident, the motion should be denied. On the issue of 'premises controlled by the insured', the terms 'premises' and 'controlled' will be dealt with separately.

"In the context of insurance exclusionary clauses, particularly water craft exclusionary clauses like the one at issue here, the term 'premises' can not be interpreted the same way in every case.

"In some cases, summary judgment has been granted because the premises were clearly specified, and there was no doubt that the accident occurred away from those premises. In *U. S. Fidelity & Guaranty Company v. Rowe*, 249 F. Supp. 993 (E. D. Va. 1966) affirmed in *Rowe v. U. S. Fidelity & Guaranty Company*, 375 F. 2d 215 (4th Cir. 1967), for example, the list of hazards insured against left no doubt that premises referred only to the insured's marina. Thus, a water craft accident one-quarter mile from the marina was clearly outside the policy. Summary judgment was granted.

"In *Snyder v. Travelers Insurance Company*, 251 F. Supp. 76 (D. Md. 1966), the insured's address was listed as all premises owned, rented, or controlled by the insured. Because the policy also referred to automobiles away from such premises, structural alterations at the premises, and elevators newly installed at the premises, the court concluded that 'Premises here must mean a fixed situs on land. . . . In short, the policy throughout speaks of "premises" as a fixed site on land . . . and not an item of maritime personal property.' *Snyder*, at 79. Thus, the contention that the barge itself constituted premises did not save the plaintiff's case from summary judgment where the accident occurred six to eight miles away at a third person's dock.

"The court interpreted premises as a shifting location because of the nomadic nature of the insured's lumber business in *Jones v. Globe Indemnity Company*, 305 F. Supp. 242 (E. D. Calif. 1969).

"Notwithstanding the listing of Ganado, Jackson County, Texas, as all premises owned, rented or controlled by the insured, the court in *American Fidelity & Casualty Company v. Traders & General Insurance Company*, 334 S. W. 2d 772, 160 Tex. 554 (1959) said at 774 of a water craft exclusion similar to that in the case at bar: 'We confess difficulty in construing the language of this exclusion. To us it is rather involved. . . . The policy is not explicit.'

"Noting that premises was not defined in the policy, nor was there a 'special

limitation of coverage to the county specified, the court concluded that a place outside the county named in the policy came within the definition of premises.

"There was another similar water craft exclusion in *Upper Columbia River Towing Company v. Maryland Casualty Company*, 313 F. 2d 702 (9th Cir. 1963). That case went to the jury despite the fact that the premises in question were two different docks owned and operated by companies other than the insured.

"These cases show that premises are interpreted broadly in favor of the insured to the extent permitted by the particular policy.

"Nowhere does the policy in the case at bar define premises nor purport to list all premises owned, rented, or controlled by the insured. In fact, the insured's place of business is not clearly delineated in the section of the policy describing the insured's premises.

"The policy does mention the use of automobiles in relation to premises under the definition of General Exposure. The coverage of automobiles at premises owned, rented, or controlled by the insured is, however, consistent with the interpretation of premises as the insured's work site. Such a provision cannot limit the scope of premises in the face of defense counsel's statement during oral argument that the barge and tug boat would be covered while dredging where formal arrangements had been made by Elam. In addition, there are no indications in the policy, such as there were in *Snyder* and *Rowe* that premises is a specific, fixed location.

"Like the term premises,

" 'it is useless to attempt a definition of the word "control" that would be applicable to all cases involving the same policy phrase since the very nature of the word itself will require an *ad hoc* determination.' *General Insurance Company of America v. American Employer's Insurance Company*, 461 P. 2d 517, 11 Ariz. 38 (1969) at 520.

"According to *Pacific Employers Insurance Company v. Hartford Accident and Indemnity Company*, 228 F. 2d 365 (9th Cir. 1955) reh. den. 1956:

" 'The word "control" has no strict or technical definition which necessarily excludes all others. *Black's Law Dictionary* (4th ed.), p. 399, defines "control" as "Power or authority to manage, direct, superintend, restrict, regulate, govern, administer, or oversee". It is said in *Rose v. Union Gas & Oil Co.*, 6 Cir., 1924, 297 F. 16, 18, "The word 'control' does not import an absolute or even qualified ownership. On the contrary, it is synonymous with superintendence, management, or authority to direct, restrict, or regulate".'

"Decisions supporting this definition, especially in the context of insurance exclusionary clauses, are too numerous to cite.

"In *Upper Columbia*, the plaintiff's effort to prove it had control of the dock where its barge was moored was unsuccessful, but the question was submitted to the jury on the strength of the following evidence. The injured parties slipped on the deck of the insured's barge while at docks not owned or rented by the insured. The docks were owned and maintained by third persons. None of the insured's employees were even on the docks or the barge when the accidents occurred during loading of the barge. The insured introduced evidence that his employee was general superintendent of the person who was in charge. Other evidence by an official of the dock owner disputed the claim of insured's superintendence over either dock.

"On this evidence, the court ruled, fairminded men could differ. The holding is somewhat weakened as applied to the plaintiff in the case at bar by the fact that the court did not rule on the sufficiency of the evidence supporting the plaintiff's case, but it merely ruled that control of the premises was not established by the plaintiff as a matter of law. Nevertheless, it is clear that the court felt the issue of control was for the trier of fact to decide. Furthermore, the court said that control over the loading operation was relevant to the issue of control but not conclusive.

"The evidence that Elam controlled the premises is even stronger than that supporting the plaintiff is *Upper Columbia.* Two of Elam's employees were present at the time of the accident. According to Aldridge's answer to interrogatory 10, Elam was responsible under the contract for properly mooring the barge: 'Employees of Al Elam were to move tug with barge to loading site and anchor barge. Aldridge employees to load scraper and tractor.'

"While the inference can be drawn from Elam's deposition that Aldridge's assumption of liability for loading and unloading included the mooring of the barge, Elam's testimony is not specific on this point. At best defendant's argument here merely raises the material issues of the substance of the agreement and what constitutes loading and unloading under the contract between Elam and Aldridge.

"If Elam did have responsibility for mooring as alleged, he had authority to direct that operation. Elam could even have such authority if Aldridge had accepted liability for Elam's mooring job, although such an assumption of liability by Aldridge would be one factor tending to disprove Elam's authority. Because the mooring operation required contact with the premises in question, and because the facts which must be taken as true on this motion indicate Elam had control over that operation, a case can be made that Elam had control of the premises.

"Defendant's claim that Aldridge's control over loading negates control over the loading is not conclusive. The claim also ignores the distinction between loading and mooring and the fact that control of the premises can be based on mooring alone.

"The cases have held that control of the premises need not be exclusive but may be shared with property owners, contractors hired by owners, and others. *See Upper Columbia. See also D'Aquilla Brothers Contracting Company, Inc. v. Hartford Accident and Indemnity Company,* 193 N. Y. S. 2d 502, 22 Misc. 2d 733 (Supreme Ct. 1959) where 'such measure of control, jointly with others as was consonant with the work done' was ruled sufficient to constitute control of the premises by a subcontractor; and *Hartford Accident and Indemnity Company v. Shelby Mutual Insurance Company,* 208 So. 2d 465 (Dist. Ct. App. Fla. 1968) where the court reversed an interpretation of control which required a proprietary interest of the same kind or class as ownership or tenancy.

"While Elam may not be a subcontractor, these cases did not turn on the insured's status on the measure of authority exercised over the premises. Thus, subcontractors have lacked sufficient authority to constitute control. *See Herbert v. California Oil Company,* 280 F. Supp. 754 (W. D. La. 1967).

"*Hall v. Moveable Offshore, Inc.,* 455 F. 2d 633 (5th Cir. 1972) illustrates the small amount of control that will suffice to support a verdict. The insured was to transport an oil rig built by Dresser-Ideco, the owner of the premises, to High Seas Co. A scaffold had been built about the rig by Safeway Scaffold Co. The

victim's employer had been hired by the insured to hoist the rig onto the insured's barge. Because the scaffold's feet were too thin, the scaffold tipped and injured the victim while he was attaching a cable to the rig. The insured had inspected the premises.

"The jury found there was control by the insured of the premises, but the trial court rendered a verdict n.o.v. The Court of Appeals reversed saying that, while the issue was contested, there was sufficient evidence to support the jury's verdict. The fact that finding control here determined tort liability should not color the result for application to insurance cases. Courts have, if anything, been more likely to find control to protect an insured.

"Courts have been willing to distinguish the authority of the insured from that of others at the premises to find control by the insured. In *American Fidelity*, the oil company dismantled an oil rig while the insured's employees moved the parts from the structure of the rig to other places on the drilling site and stacked them. This was deemed sufficient control of the premises because the insured determined how the trucks were to be used, where the parts were to be stacked, and supervised the loading and unloading of the trucks.

"A thorough search has revealed no instance where summary judgment was granted on the issue of control of the premises in the face of facts as supportive of the plaintiffs' position as in the case at bar.

"Plaintiffs' contention that 'control' is ambiguous is unnecessary. Control as used in this policy and as interpreted by the courts is sufficiently broad to include plaintiffs' allegations. The only ambiguity would result from an assertion against the weight of authority that the term should be read narrowly. Defendant suggests such a reading when it contends control of loading is necessary to constitute control of premises; that because the accident 'involved' loading, control by Elam is precluded; and that control of the premises by Aldridge precludes control by Elam. To the extent that defendant introduces such ambiguities, they must be resolved in favor of the plaintiff."

In short, the trial court held that whether Elam "controlled" the "premises" where the accident happened was a question of fact, and could not be determined as a question of law. (It also found a factual issue raised as to whether there was any "liability assumed" by Elam under a "contract," an issue we do not reach.) We agree with the trial court's conclusion, which is amply supported by the authorities cited by it.

The strongest cases cited by Western lend little support to its position that, as a matter of law, Elam did *not* control the premises where the accident occurred. The closest factually is *Upper Columbia River Towing Co. v. Maryland Casualty Co.*, 313 F. 2d 702 (9th Cir. 1963), cited by the trial court. There two workmen were injured in two separate accidents on the insured's barge, moored at different times to two docks owned and operated by other companies. The appellant (insured) contended

that the evidence showing its control over loading operations made the watercraft exclusion inapplicable as a matter of law. The Ninth Circuit rejected the argument, saying:

"The applicability of the exclusion, however, clearly was made to depend upon whether or not the 'premises' were controlled by appellant. Although evidence tending to show control over the loading operation may have been relevant to the determination as to whether appellant had control over the premises, such evidence was not conclusive on that issue. The evidence was not such in this case that fairminded men could not have drawn different inferences therefrom. Therefore, the district court would not have been justified in holding that as a matter of law either dock was under the control of appellant. We hold that the court properly submitted the issue of control to the jury." (313 F. 2d at 705-6.)

The holding supports the trial court's conclusion that where different inferences may reasonably be drawn from the evidence, "control" is a question for the finder of fact.

In *Snyder v. Travelers Insurance Company*, 251 F. Supp. 76 (D. Md. 1966), also referred to by the trial court, the policy insured against liability arising out of the "ownership, maintenance or use of premises, and all operations." The policy specifically described by street address the location of "all premises owned, rented or controlled" by the insured. That, together with other language in the policy, led the court to conclude that a floating crane was not the kind of "premises" meant by the policy. Here, however, no premises are described in Elam's policy, although a place for such a description is provided. We cannot infer, as the *Snyder* court did, that "premises" in the policy was intended to refer to "a fixed site on land." In this case, "premises" could be any premises, so long as there was the requisite control by the insured. (Western cites this case for, and devotes a substantial portion of its brief to, the proposition that the *barge* did not constitute "premises." As we understand it, neither plaintiffs nor the trial court ever suggested that it did.)

*Universal Towing Co. v. Hartford Fire Insurance Co.*, 297 F. Supp. 1290 (E. D. Mo. 1969), did not involve either "premises" or "control." Coverage was provided to the insured towing company only for occurrences which took place "at the Insured's Terminal(s)," which were supposed to be listed in the policy. None was listed, and the insured therefore claimed coverage not only for the three it owned but also for one where it serviced an anchor fleet for another towing company. The court construed "the Insured's Terminals" to mean only those owned by the insured. That

construction was based in large part on auditing procedures under the policy whereby premiums were based on daily counts of barges located at the covered terminals. Barges located at the fourth terminal were never counted by the insured, and no premiums were paid for them. Here we have no such extrinsic evidence which would lead to an operative construction of the policy.

Western makes much of the conceded fact that Missouri law applies in construing the policy in question here, and strenuously urges that the trial court misapplied the law of our sister state. We find nothing peculiar about the Missouri rules, nor do we find any misapplication. In *Wendorff v. Mo. State Life Ins. Co.*, 318 Mo. 363, 370, 1 S. W. 2d 99, 57 A. L. R. 615 (1927), the Missouri court said:

"In the construction of the policy, the rules to be followed are well settled. The policy is a contract. Plain and unambiguous language must be given its plain meaning. The contract should be construed as a whole; but *insofar as open to different constructions, that most favorable to the insured must be adopted.* [Citation omitted.] However, as said in 14 Ruling Case Law, sec. 103, p. 931, the rule 'does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists.' " (Emphasis added.)

(See, also, *Central Surety & Ins. Corp. v. New Amsterdam Cas. Co.*, 359 Mo. 430, 222 S. W. 2d 76 [1949]; *Universal Towing Co. v. Hartford Fire Insurance Co.*, supra.) The Missouri rules appear indistinguishable from those routinely applied by Kansas courts to Kansas policies. (See, e. g., *Mah v. United States Fire Ins. Co.*, 218 Kan. 583, 545 P. 2d 366, and cases cited at 586-7.)

The trial court in this case simply held that the policy was not so unambiguous that the term "premises" in the policy was clearly limited to Elam's principal base of operations, or that the "control" contemplated was clearly exclusive control. Such holdings did no violence to either Missouri law or the terms of the policy.

The trial court made two other pretrial rulings which Western challenges on appeal. First, it found the federal judgment was entitled to full faith and credit, and precluded Western from relitigating the issue of Elam's negligence. Western concedes that under Missouri law "generally a liability insurer does not have a right to open or set aside matters relating to the merits of a judgment awarded in favor of an injured person against a policy-

holder of the insurer in an action in which the insurer did not appear to defend." (Appellant's Brief, p. 29.) But, it says, an exception is made where the judgment is obtained by fraud or collusion.

In support of this proposition Western cites *Lane v. Hartford Fire Insurance Company*, 343 F. Supp. 79 (E. D. Mo. 1972), which in turn relies on *Wells v. Hartford Accident and Indemnity Company*, 459 S. W. 2d 253 (Mo. 1970). Those cases do recite the Missouri general rule, and the fraud or collusion exception, but do no more than that to support Western's position here.

In *Wells* the Missouri court held that a carrier of uninsured motorist insurance, having had an opportunity to intervene in its insured's action against an uninsured motorist, was bound by the results of that action on the issues of liability and damages. We see no comfort for Western in that holding.

In *Lane* plaintiff had taken a default judgment against the defendant's insured, one LeRoy McDonald, based on a stipulation not to execute which was strikingly similar to the one entered into in this case between plaintiff's and Western's insured. The court held:

"The state court record does not show fraud or collusion in obtaining the prior judgment. The fact that LeRoy McDonald did nothing to contest plaintiff's claims against him alone does not support an inference that the judgment was obtained by fraud or collusion. Eakins v. Burton, 423 S. W. 2d 787, 790 (Mo. 1968). The agreement between plaintiff and LeRoy McDonald whereby plaintiff agreed not to levy execution upon obtaining a judgment against LeRoy McDonald was not fraudulent or collusive. Section 537.065 R.S. Mo. 1969, V.A.M.S., expressly authorizes agreements of this nature." (343 F. Supp. at 85.)

So, here, the fact that the federal judgment was based on the statutorily authorized stipulation gives rise to no inference of fraud or collusion. The record shows that Elam stoutly defended itself through several lawsuits, and finally settled. Western chose not to defend its insured and is bound by the result.

The other pretrial order was a summary judgment denying Western's counterclaim against Aldridge for indemnity. The trial court found that Elam, as part of the settlement of the federal suit, had dismissed its counterclaim in that suit based on the same theory as Western's counterclaim here. It found:

"1. That the counterclaim filed by Al Elam Construction Co. in the Federal case was compulsory in nature pursuant to Rule 13(a) of the Federal Rules of Civil Procedure;

"2. That had defendant herein undertaken the defense of the Federal case when demand was made upon it to do so, it could have prosecuted the counterclaim in the Federal case;

"3. That the defendant herein has no claim for indemnification except through the subrogation clause in its liability policy with its insured, Al Elam Construction Co.;

"4. That the defendant stands in the shoes of its insured and has no greater rights herein than would Al Elam;

"5. That any claim for indemnification against R. G. Aldridge and its carrier by Al Elam was disposed of in the stipulation and subsequent Federal disposition;

"6. That Al Elam and its carrier (defendant herein) are barred by the doctrine of res judicata from asserting the counterclaim which the carrier is asserting herein;

"7. That the defendant herein denied its insured defense in the Federal case on the ground that the incident was not covered by the policy and accordingly lost its right to direct the defense of same;

"8. That the defendant made such denial of defense after an admittedly full investigation of the facts;

"9. That the defendant knew or should have known that under Missouri law the actual disposition reached in the Federal case with its limitation on the levying of execution was a possibility;

"10. That the plaintiffs' motion to dismiss the counterclaim should be and is hereby sustained; and

"11. That the scope of the trial is limited to the issue of whether or not coverage is afforded under the policy for the judgment rendered in the Federal Court."

Western's argument here is that even if it is bound by the federal judgment, the estoppel goes no further than to those matters necessarily proved to sustain the judgment against Elam. It does not go, it says, to Western's right as an indemnitor to recover over against Aldridge who, it alleges, really caused the loss and contracted to pay it.

The argument overlooks the effect of Elam's counterclaim in the federal case and its dismissal. The trial court was clearly right in finding under familiar principles of subrogation that Western stands in the shoes of Elam. Thus any defenses good against the insured are also good against the insurer as subrogee. See, *New Hampshire Ins. Co. v. Fox Midwest Theatres, Inc.*, 203 Kan. 720, 457 P. 2d 133; *Liberty Mut. Ins. Co. v. Fales*, 8 Cal. 3d 712, 106 Cal. Rptr. 21, 505 P. 2d 213 (1973); 44 Am. Jur. 2d, *Insurance*, § 1821. Aldridge was a plaintiff in the federal case, and Elam's counterclaim arose out of the same transaction. When, as part of the settlement, Elam dismissed its counterclaim and permitted Aldridge to take judgment against it, Elam barred itself from further action on the claim. See, *Robinson v. Railway Co.*, 96 Kan.

137, 150 Pac. 636, Syl. 5; 50 C. J. S., *Judgments,* § 705; 47 Am. Jur. 2d, *Judgments,* § 1095. Since Elam could no longer pursue the counterclaim, neither could its insurance carrier Western.

Having thus limited the issues, the trial court proceeded to hear the case pursuant to the parties' stipulation, and to make the findings of fact quoted in part above. The essence of those findings was that Elam exercised some control over the premises where the accident occurred, albeit jointly with Aldridge. Its pertinent conclusions of law were:

"3. There is no requirement that 'control' as the term is used in the insurance contract herein be exclusive.

"4. The tug and barge were being operated on a navigable stream on which a proper permit to operate had been issued.

"5. Al Elam had sufficient 'control' over the 'premises' where the accident occurred to be covered under the provisions of said policy."

We are asked to overturn these conclusions, but we cannot do so. The accident happened some three-fourths of a mile downstream from the area where Elam regularly dredged, but that is not controlling. Even under Missouri law, as noted above, "insofar as open to different constructions, that most favorable to the insured must be adopted." (*Wendorff v. Missouri State Life Ins. Co.,* supra.) If the policy had been meant to be confined to those "premises" where Elam had a leasehold, it would have been easy enough to say so. Absent such a policy restriction the trial court was amply warranted in finding that "premises" could include other areas in the river or on its banks, so long as Elam was exercising control.

Likewise, the policy did not limit "control" to exclusive control, so that applying the same principle of construction the trial court was justified in concluding that joint control was enough. Elam's employees directed the mooring operation and told Aldridge's people when to move the tractors on the bank so as to make the cables taut; Aldridge's men scraped the bank and moved the equipment. The premises—the bank and the river immediately adjacent to it—were therefore under the joint control of Elam and Aldridge. That was enough to remove the accident from the watercraft exclusion clause.

Affirmed.