No. 61,989

FIRST HAYS BANSHARES, INC., *Plaintiff-Appellee*, v. KANSAS BANKERS SURETY Co., *Defendant/Third-Party Plaintiff-Appellant*, v. DON E. PRATT and STEVEN D. PRATT, *Third-Party Defendants.*

(769 P.2d 1184)

Opinion filed March 7, 1989.

*Deanne Watts Hay,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause, and *Myron L. Listrom, Alan V. Johnson,* and *Stanley R. Parker,* of the same firm, were with her on the briefs for appellant.

*Jack E. Dalton,* of Mangan, Dalton, Trenkle, Rebein & Doll Chartered, of Dodge City, argued the cause, and *Michael A. Doll,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This case arises from banker's blanket bonds issued by the defendant, Kansas Bankers Surety Company. The

plaintiff, First Hays Banshares, Inc., (Banshares) brought the present action against the defendant, contending that it improperly denied coverage under the bonds for various misdeeds perpetrated by one of the directors of a bank owned by the plaintiff. The defendant, Kansas Bankers Surety (KBS) appeals various rulings by the trial court.

The facts underlying the present case may be briefly summarized. The banker's blanket bonds in question were issued to a bank owned by Banshares, First National Bank of Hays City (First National). The two bonds, issued with an effective date of July 25, 1984, are designated Bond No. 1570KR and Bond No. 28-4670. Bond No. 1570KR provides a stated liability limit in the amount of $1,050,000, subject to a $1,000 deductible. Bond No. 28-4670 provides a stated liability limit of $1,000,000, subject to a deductible in the amount equal to the coverage provided by Bond No. 1570KR.

Steven D. Pratt was a member of the board of directors of First National and a member of the directors' compliance and discount committees. In 1984 and 1985, Pratt obtained several loans from First National, allegedly secured by a purchase money security interest in cattle. It was later discovered that the cattle did not exist. In addition, Pratt deposited several insufficient funds checks for substantial amounts with First National. First National discovered Pratt's activities on July 17, 1985.

The present action arose after KBS, on August 13, 1985, denied coverage for First National's losses arising from Pratt's activities. Banshares, which purchased Pratt's obligations from First National, filed the present action against KBS on June 3, 1986. On May 4, 1987, the district court granted partial summary judgment on behalf of Banshares, finding that Pratt's activities at First National were covered within the scope of the banker's blanket bonds issued by KBS. The jury returned a verdict of $5,269,959.81 on behalf of the plaintiff. This award reflects direct, actual damages in the amount of $1,497,834.23, and consequential damages in the amount of $3,772,125.58. Additional facts will be discussed as relevant to determine the issues herein.

The defendant contends that the district court erred in denying summary judgment on its behalf, based upon a settlement agreement between Pratt and First National. The September 18,

1985, settlement agreement reflects an agreement between Pratt and his father, Don Pratt, and five banks, including First National. Under the terms of the agreement, Don Pratt agreed to pay First National $1.6 million. In exchange, First National "agreed to fully and completely release any and all claims against Steven D. Pratt, his family, or any business organization controlled by the Pratt family." KBS contends that the September 18 settlement agreement releases it from any liability under the bond by creating a complete "circle of indemnity," and by violating the terms of the bonds.

We first consider the defendant's circle of indemnity argument. In support of its argument, KBS relies on *Dennis v. Southeastern Kansas Gas Co.*, 227 Kan. 872, 610 P.2d 627 (1980). In *Dennis*, the plaintiffs brought a personal injury action for damages suffered in a gas explosion against the City of Moran, Kansas, and against the gas company supplying gas to the city. The city ordinance granting the gas company a franchise for the supply of gas to the city and its inhabitants required the gas company to hold the city harmless for any liability arising from the supply of gas. The city filed a cross-claim against the gas company and obtained a default judgment against it for all damages that might be awarded to the plaintiffs in their claim against the city. The plaintiffs, meanwhile, entered into a settlement agreement with the gas company, in which the plaintiffs agreed to hold the gas company and its successor in interest harmless from any claims arising from the gas explosion which formed the basis for the plaintiffs' petition.

The trial court granted summary judgment on behalf of the city, accepting the city's argument that a complete circle of indemnity had rendered the plaintiffs' remaining claim against the city moot. The court briefly summarized the circle of indemnity underlying the summary judgment order:

"Under the judgment finalized April 6, 1978, in favor of the city on its cross-claim against the gas company, the gas company became obligated to indemnify the city of Moran for any amounts recovered by the plaintiffs on their claim against the city. By their agreement of January 16, 1976, the plaintiffs agreed to indemnify the gas company for any amounts which it might be required to pay as a result of the explosion on which the suit was based. Thus, the city argued in its motion, there is a full circle of indemnity running from the plaintiffs to the city. Should plaintiffs recover a judgment against the city of Moran, the city will be entitled in turn to recover that same amount from the gas company pursuant to the city's judgment for indemnity. The gas company in turn will be entitled to

recover that same amount back from the plaintiffs, pursuant to the settlement and hold-harmless agreement of January 16, 1976. The end result is that, through this indirect process, plaintiffs will be required to indemnify the city for any judgment recovered by plaintiffs against the city." *Dennis v. Southeastern Kansas Gas Co.*, 227 Kan. at 875.

On appeal, we first determined that the default judgment in the city's cross-claim against the gas company was res judicata and binding upon the plaintiffs. We then concluded by affirming the decision of the trial court, finding that the plaintiffs' claim against the city had been rendered moot by the complete circle of indemnity in the case. 227 Kan. at 880.

In the present case, defendant KBS contends that a complete circle of indemnity exists as a result of the September 18, 1985, settlement agreement between First National and Pratt. Under the defendant's theory, if it is required to pay damages to Banshares (which purchased Pratt's obligations from First National), it will possess an independent right of action against Pratt. KBS contends that, as a surety, it possesses an inherent subrogated right of action against its principal debtor. KBS argues, however, that if it recovers in its subrogated right of action against Pratt, Pratt will be able to reimburse its losses by bringing an action to enforce the terms of the September 18, 1985, settlement agreement against Banshares. Banshares would then be required to disgorge the damages it received from defendant KBS, thereby completing the alleged circle of indemnity.

We find no merit in the defendant's argument. The defendant's theory rests upon the determination of whether defendant KBS is more in the nature of a surety, thereby possessing an independent subrogated right of action against Pratt, or whether it is merely an insurer without a direct indemnification right against Pratt. The defendant relies upon two Court of Appeals cases, *Home Life Ins. Co. v. Clay*, 11 Kan. App. 2d 280, 719 P.2d 756, *rev. denied* 239 Kan. 693 (1986), and *Western Surety Co. v. Loy*, 3 Kan. App. 2d 310, 594 P.2d 257 (1979).

Neither case supports the defendant's argument. Neither *Home Life Ins.* nor *Western Surety* directly discusses the status of the issuer of a fidelity bond, and whether the issuer possesses an independent indemnification right against the person who is the subject of the bond. In *Home Life Ins.*, the Court of Appeals discussed the requirement for timely notice by the bondholder to the issuer of the bond. The Court of Appeals referred to the

defendant bond issuer both as an "insurer" and as a "surety." 11 Kan. App. 2d at 286-89. In *Western Surety*, the bond issuer's status as a surety was undisputed by the parties. In neither decision did the Court of Appeals directly or indirectly approach the present issue: Whether the issuer of a fidelity bond, who has allegedly breached the terms of the bond by denying coverage, possesses an independent right of action against the employee or other person who is the subject of the bond.

Other Kansas cases support the conclusion that a fidelity blanket bond, such as that present in this case, creates an insurance relationship rather than a suretyship. In *Ronnau v. Caravan International Corporation*, 205 Kan. 154, 468 P.2d 118 (1970), this court noted that a fidelity bond is "an indemnity insurance contract whereby one for consideration agrees to indemnify the insured against loss arising from the want of integrity, fidelity or honesty of employees or other persons holding positions of trust." 205 Kan. at 159. In *Docking v. National Surety Co.*, 122 Kan. 235, 240, 252 Pac. 201 (1927), this court noted that a fidelity bond is "in effect, a contract of insurance."

We find other courts are in general agreement. A fidelity bond "is basically a contract of insurance and indemnity rather than a contract of suretyship." *Arlington Trust Co. v. Hawkeye-Security Ins. Co.*, 301 F. Supp. 854, 859 (E.D. Va. 1969). In *Bank of Acworth v. Firemen's Ins. Co. of Newark, N.J.*, 339 F. Supp. 1229 (N.D. Ga. 1972), the court rejected a contention by the defendant that the type of fidelity bond known as a banker's blanket bond created a suretyship relationship:

"The Court cannot agree with the defendant's theory that this is a suretyship situation, but rather finds that this is a case dealing with insurance law. The language of the bond itself reflects the language of an insurance contract as it refers in various places to the 'insured,' the 'insurance,' the 'underwriter,' and the 'policy.' A study of the terms used also makes it clear that by the bond the defendant company intended to insure the fidelity of the plaintiff's employees and that the defendant company agreed to indemnify the plaintiff for any loss resulting from fraudulent or criminal acts by its employees. Such an undertaking clearly represents an agreement for fidelity insurance." 339 F. Supp. at 1230.

Applying Kansas law, the United States District Court for the District of Kansas defined a banker's blanket bond as an insurance contract in *Kan. State Bank & Trust v. Emery Air Freight*, 656 F. Supp. 200, 202 (D. Kan. 1987). Citing the decision of this court in *Ronnau*, 205 Kan. at 154, a federal district court has

stated: "Although there is authority for defendant's position that a fidelity bond purchased by a corporation to protect itself from financial wrongdoing by its employees is a matter of suretyship . . . [,]the more persuasive view, and that adopted in recent cases and commentaries, is that a fidelity bond should be treated as insurance." *Luso-American Credit Union v. Cumis Ins. Soc.*, 616 F. Supp. 846, 848 (D. Mass. 1985).

The defendant, as an insurer, does not possess an independent claim for indemnification or subrogation against Pratt and is limited to its insured's rights against the alleged wrongdoer. See *Fidelity & Deposit Co. of Maryland v. Smith*, 730 F.2d 1026, 1030 (5th Cir. 1984); *Nat. Union Fire Ins. Co. v. Continental Ill. Corp.*, 658 F. Supp. 775, 780 (N.D. Ill. 1987). Nor is the indemnification link between Pratt and Banshares established. In exchange for the hold-harmless agreement contained in the September 18, 1985, settlement agreement, Don Pratt agreed to make monthly payments to First National and, later by assignment, to Banshares. However, the trial court found that Don Pratt ceased making the payments required under the settlement agreement in February 1986, and that current payments "are due, owing and unpaid." In *Dennis*, the two "links" of indemnification rights in the circle of indemnity were established either by a voluntary and executed agreement entered into by the plaintiffs or by a res judicata determination of indemnification liability by a district court. In the present case, on the other hand, the settlement agreement entered into by the plaintiff's predecessor in interest (First National) has not been fully executed; indeed, the trial court has found that the settlement may have been breached. Moreover, unlike *Dennis*, the party asserting the circle of indemnity argument (defendant KBS) has not previously established a res judicata right to complete indemnification by the third party (Pratt). A complete circle of indemnity has not been shown to exist in the present case, and the trial court properly denied that portion of the defendant's summary judgment motion resting upon this theory.

We note in passing that KBS and Steven Pratt entered into a "settlement agreement" on October 27, 1987, a few weeks prior to the trial of the present case on December 14, 1987. In the settlement agreement, KBS dismissed its third-party claim against Pratt in exchange for Pratt's agreement to indemnify KBS

for any damages recovered from KBS by Banshares in the present action. The agreement also authorized KBS to file suit against all parties liable to Pratt under the September 18, 1985, settlement agreement. On November 24, 1987, KBS filed a declaratory judgment action against Banshares, seeking a declaratory judgment of its rights under the 1985 settlement agreement. The United States District Court for the District of Kansas rejected KBS's claim in *Pratt v. First Hays Banshares, Inc.*, 682 F. Supp. 1177 (D. Kan. 1988). The district court stated:

"In fact, the court is left with the definite impression that the only reason the transaction was arranged in this fashion was so KBS could get into federal court. This theory seems especially plausible when we examine the course of the Ford County litigation. In that case, KBS sought summary judgment on a 'circle of indemnity' theory, and tried to argue it was not liable to FHB [Banshares] on this theory. The court need not expound on this argument here. We only need note that KBS appears to be seeking to avoid the Ford County court and to complete the 'circle' by getting back at least a portion of the amounts owed under the Ford County judgment, through a clever settlement agreement with Pratt." 682 F. Supp. at 1181.

The district court dismissed the declaratory judgment action, finding a lack of subject matter jurisdiction.

We next turn to defendant KBS' contention that the September 18, 1985, settlement agreement voided coverage, according to the terms of the bonds. The defendant relies upon § 7(e) of the Conditions and Limitations portion of the bonds, which provides, in part: "The insured shall do nothing after discovery of loss to prejudice such rights or causes of action." The defendant contends that, by entering into the settlement agreement without its prior approval, First National forfeited its rights under the bonds.

KBS, however, has admitted that it denied First National coverage under the bonds on August 13, 1985, prior to First National's settlement negotiations with Pratt. By denying coverage under the bonds, the defendant forfeited its rights to prior approval of any settlement agreements entered into by the insured.

"It is well settled that, at least after a denial of liability by an insurer, the insured may enter into a settlement with a third party without prejudicing its rights against the insurer. See *e.g., Vanguard Ins. Co. v. Polchlopek*, 18 N.Y.2d 376, 382, 275 N.Y.S.2d 515, 520, 222 N.E.2d 383 (1966); *Cardinal v. State*, 304 N.Y. 400, 410-11, 107 N.E.2d 569 (1952), *cert. denied as not timely applied for* 345 U.S. 918, 73 S. Ct. 729, 97 L. Ed. 1351 (1953); *In re People ex rel. Emmet (Empire State Surety Co.)*, 214 N.Y. 553, 563-64, 108 N.E. 825 (1915).

"To require that the insured first fully litigate its dispute with the insurer before pursuing the third party would be manifestly unfair. The possibility of prompt reimbursement would be lost. Moreover, because of the financial condition of the third party or the size of other claims pending against it, it might be essential that redress against the third party be promptly pursued lest nothing remain to satisfy insured's claim. On the other hand, the self-interest on the insured affords considerable protection to the insurer under the present rule. Recognizing the possibility that his suit against the insurance company may fail, the insured will attempt to recoup as much of his losses as possible from the third party. If the insurer is ultimately held liable, the amount so recovered will inure to its benefit." *Bunge Corporation v. London and Overseas Insurance Co.*, 394 F.2d 496, 497 (2d Cir. 1968).

Similarly, in *Midland Bank & Trust Co. v. Fid. & Deposit Co. of Md.*, 442 F. Supp. 960, 973 (D.N.J. 1977), the United States District Court for the District of New Jersey found that equity prevented an insurer from escaping liability under the terms of a fidelity bond by the attempts of its insured to mitigate its losses by entering into settlement agreements after the insurer had denied any liability. See also *Shelman v. Western Casualty & Surety Co.*, 1 Kan. App. 2d 44, 54, 562 P.2d 453, *rev. denied* 221 Kan. 757 (1977), where the Court of Appeals, applying Missouri law, held that absent fraud or collusion an insurer who chooses not to defend its insured is bound by the resulting settlement or judgment.

The defendant relies in particular upon *Sec. Nat. Bank of Kansas City v. Continental Ins.*, 586 F. Supp. 139 (D. Kan. 1982). This case is distinguishable from the present case in that there is no indication that the insurer had explicitly denied coverage prior to the settlement agreement being entered into by the insured. The case is simply a restatement of the general rule and does not address the impact of the insurer's prior denial of coverage upon the insured's right to mitigate its damages by entering into negotiations with third persons.

Next, defendant KBS contends that the trial court erred in granting summary judgment on behalf of plaintiff Banshares, ruling that Pratt's misdeeds fell within the coverage provided by the bonds. The district court ruled that Pratt's employment was covered by the terms of the bonds as a director participating in committees performing specific directorial acts. KBS contends that the parties to the bonds did not intend to include Pratt within the scope of their coverage, that Pratt was not an "em-

ployee" of First National, and that the coverage of Pratt is excluded by the director exclusion contained in § 2(d).

Section (A) of the Insuring Agreements section of the bonds defines the general scope of the instrument's coverage: "Loss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others."

An "employee" under the bonds is defined, in part, by § 1(f)(1) of the Conditions and Limitations portion of the bonds: "Employee means . . . an officer or other employee of the Insured, while employed in, at, or by any of the Insured's offices or premises covered hereunder, and a guest student pursuing studies or duties in any of said offices or premises."

Directors of the named insureds are generally excluded from coverage under the bonds except in limited circumstances. Section 2(d) of the bonds provides:

"This bond does not cover . . . loss resulting directly or indirectly from any acts of any director of the Insured other than one employed as a salaried, pensioned or elected official or an Employee of the Insured, except when performing acts coming within the scope of the usual duties of an Employee, or while acting as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured."

The defendant bases its first argument that the parties did not intend to include Pratt within the scope of the coverage provided by the bond by stressing that Pratt was not listed on First National's application for bond coverage. The "annual application and renewal" form filed with KBS by First National contained space in which the applicant is to "List All Officers and Employees." The completed application contains the names of 50 officers and employees of First National, but does not include Steven Pratt.

The bonds contained no provision limiting their coverage to the acts of those employees who are named in the application form. Plaintiff Banshares contends that it was unnecessary to name Pratt in the application form, noting that First National's attorneys need not be listed on the application, but are nonetheless covered within the scope of the bonds by § 1(f)(2), defining an employee as also including "an attorney retained by the Insured and an employee of such attorney while either is performing legal services for the Insured." However, even if it is correct that employees need not be listed in the application form,

this still does not establish that the parties intended the bond to include Pratt in their coverage.

Whether a particular employee is listed in the application for a fidelity bond may be important evidence of whether the parties intended to include such employee within the scope of the bond's coverage. See, *e.g.*, *Third Fed. S. & L. Ass'n v. Firemen's Fund Ins.*, 548 F.2d 166 (6th Cir. 1977); *National Bank v. Fidelity & Casualty Co.*, 125 F.2d 920 (4th Cir. 1942). It will not, however, be dispositive in all cases. The issue remains one of the intent of the parties. In the application at issue in the present case, the party filling out the application is required to list "All Officers and Employees," but the form does not require a listing of directors belonging to committees performing specific directorial acts. On the other hand, the insured requires some knowledge of the number of persons to be included within the bond in order to determine its risk of loss and the appropriate premium.

Neither the bond itself nor the application for the bond contains a provision limiting the coverage of the bond to those employees or persons listed in the application, nor a provision providing that coverage of the bond extends to any and all persons employed by First National, regardless of whether they were named in the bond application form. If Pratt is an employee, then a factual question existed as to whether the parties intended Pratt to be included within the scope of the bond coverage as an employee.

KBS contends that Pratt is excluded from coverage of the bond because he is not "an employee" of First National, since it did not possess a right to control his activities as a director of the bank. However, the bond obviously contemplates a more generalized concept of the term "employee," since it explicitly includes the director exclusion contained in § 2(d). If the bond only provided protection against the activities of those persons who are employees in the classic, common-law sense, there would be no need for the § 2(d) director exclusion.

A similar argument was advanced before the Washington Court of Appeals in *Puget Sound Bank v. St. Paul Fire Ins.*, 32 Wash. App. 32, 645 P.2d 1122 (1982). The defendant insurer contended that its fidelity bond did not include the acts of Dreitzler, a director of the bank.

"St. Paul first argues that Dreitzler was not an 'Employee' of the bank and his

acts were therefore not covered by the bonds. We find it unnecessary to decide whether Dreitzler was an 'Employee,' *i.e.*, a common law employee of the bank, in order to determine whether his fraudulent acts were within the purview of the bonds. To limit coverage to loss caused by 'Employees' would ignore the director's exclusionary clause, which excludes coverage for any 'loss resulting from any act or acts of any director of the Insured other than one employed as . . . an Employee of the Insured, *except when performing acts coming within the scope of the usual duties of an Employee.*' (Italics ours.) If only 'Employees,' as defined in the bond, were covered, then the latter part of the exclusion would be superfluous, since the clause already provides coverage for those directors who are 'Employees' and excludes those who are not. The latter part of the exclusionary clause, if it is to be given effect at all, must be read as providing coverage for non-'Employee' directors who perform acts ordinarily performed by 'Employees' resulting in loss to the bank. Ambiguous exclusionary clauses in insurance policies are construed strictly against the insurer. *Dairyland Ins. Co. v. Ward,* 83 Wash. 2d 353, 517 P.2d 966 (1974)." 32 Wash. App. at 37.

We note that the decision in the *Puget Sound* case was based upon a finding that the director was performing acts coming within the scope of the usual duties of an employee. Such is not the case presently before this court: The district court's conclusion that Pratt was "not just a director but his duties and responsibilities far transcended 'general directorial acts,' " is not determinative of this issue.

The construction and effect of a banker's blanket bond, like other contracts, is a question of law to be determined by the court. The primary rule in construing any contract is to give effect to the intentions of the parties. Where a provision in a bond is clear and unambiguous, it must be given its plain meaning and enforced accordingly. If the bond provision is unambiguous, there is no need for judicial interpretation. *Goforth v. Franklin Life Ins. Co.,* 202 Kan. 413, 449 P.2d 477 (1969). Section 2(d) of the bonds in the present case is such a provision. It specifically excludes directors "except when performing acts coming within the scope of the usual duties of an Employee, or *while acting* as a member of any committee duly elected or appointed by resolution of the board of directors of the Insured to perform specific, as distinguished from general, directorial acts on behalf of the Insured." (Emphasis added.) We interpret § 2(d) to clearly require that a director is covered only for acts committed while he is acting as a member of such a committee and not, as the trial court concluded, solely because he was a member of the discount or compliance committees. A factual issue therefore exists as to whether Pratt was so acting in the

present case. The district court incorrectly found as a matter of law that Pratt was an "employee" within the terms of the bonds, and that his actions were covered under the bonds. The district court, therefore, erred in granting summary judgment when a factual issue existed as to whether the loss occurred as the result of Pratt's acting as a member of either the discount or compliance committees.

KBS next argues that the district court erred in finding, in its grant of summary judgment, that Pratt's actions reflected dishonesty or fraudulent behavior. The fidelity bonds which are the subject of the present litigation provide insurance coverage for losses resulting from the "dishonest or fraudulent acts" of employees of First National. The bonds define such acts to mean

"only dishonest or fraudulent acts committed by such Employee with the manifest intent

"(a) to cause the Insured to sustain such loss, and

"(b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment."

*First Nat. Bank Co., Etc. v. Insurance Co.*, 606 F.2d 760, 768 (7th Cir. 1979) states: "The words 'dishonest' and 'fraudulent' used with reference to conduct covered by a fidelity bond are to be given a broad meaning. [Citations omitted.] Their connotation is broader and more comprehensive than the word 'criminal'; and they include acts which show a want of integrity or breach of trust." As used in a fidelity bond, "both misrepresentation of facts and deliberate deception by pretense and stealth constitute dishonest and fraudulent conduct." *Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co.*, 426 F.2d 729, 737 (5th Cir. 1970).

In its journal entry granting the plaintiff's motion for partial summary judgment, the district court concluded that Pratt's activities manifestly represented a series of dishonest and fraudulent acts and demonstrated "a calculated scheme by which he used his extraordinary position of trust to enhance his personal financial gain at the expense of his employer."

Based upon the facts of the present case, the district court could reasonably conclude that dishonesty and fraud permeated Pratt's entire course of dealing with the bank. See *Midland Bank & Trust Co. v. Fid. & Deposit Co. of Md.*, 442 F. Supp. at 971.

KBS also argues that the insurance coverage provided by the bonds was automatically terminated prior to the losses incurred by First National, through the operation of § 12 of the Conditions and Limitations portion of the bonds. Section 12 provides, in part:

"This bond shall be deemed terminated or canceled as to any Employee or any partner, officer or employee of any Processor—(a) as soon as any Insured, or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by such person at any time against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person, or (b) 15 days after the receipt by the Insured of a written notice from the Underwriter of its desire to terminate or cancel this bond as to such person."

The defendant contends that the coverage provided by the bond terminated when First National first became aware of insufficient funds checks deposited by Pratt prior to his misdeeds which are currently at issue. However, although the bank had knowledge of some earlier returned checks, there is no evidence in the record that, at that time, First National was aware that Pratt was engaging in dishonest or fraudulent conduct. We conclude that the provision requires actual knowledge and not mere suspicion or a reason to know of the wrongdoing. See *Midland Bank & Trust*, 442 F. Supp. at 972.

KBS also argues that the trial court erred in excluding evidence of First National's alleged negligence prior to July 17, 1985. We do not agree. The evidence presented to the district court in the summary judgment motions and motions in opposition support the finding that First National did not obtain actual knowledge of Pratt's misdeeds until July 17, 1985. The district court permitted the defendant to present any evidence of First National's alleged negligence occurring after this date. Had the district court permitted the defendant to introduce evidence of the insured's negligence prior to this date, it would have acted inconsistently with the general rule that mere negligence by the insured does not absolve the insurer from liability under a fidelity bond. *Arlington Trust Co.*, 301 F. Supp. at 858.

KBS next contends that Ford County was not an appropriate venue for the present action and that the district court erred in refusing its motion for a change of venue. KBS contends that the location of the proper venue for the present action is determined by K.S.A. 78-103, which provides for venue of actions against surety companies. K.S.A. 78-103 provides, in part:

"Any surety company doing business under the provisions of this act may be sued in respect thereof in any court of the United States or in the state of Kansas which has now, or hereafter may have, jurisdiction of actions on suits upon such recognizance, stipulation, bond or undertaking in the district in which such recognizance, stipulation, bond or undertaking was made or guaranteed, or in the district in which the agent of such company is located."

KBS contends that, under K.S.A. 78-103, it may not be sued in Ford County, but only in the district where its agent was located (Shawnee County), or the district in which the bond was made (Ellis County). We do not agree. First, as noted earlier, the essence of the fidelity bond in the present case is the establishment of an insurance relationship rather than a suretyship. Thus, K.S.A. 40-218, providing for venue in actions against insurance companies, provides a more appropriate basis for determining venue in the present action. Second, and more importantly, it should be noted that K.S.A. 78-103 uses the permissive term "may be sued" in designating the districts in which an action may be brought against a surety company. This language indicates that K.S.A. 78-103 provides a list of permissible venues for such actions, but not an exclusive list.

K.S.A. 40-218 provides, in part, that an insurance company transacting business in Kansas must consent to domestic litigation

"in the proper court of any county in this state in which the cause of action shall arise or in which the plaintiff may reside by the service of process on the commissioner of insurance of this state, and stipulating and agreeing that such service shall be taken and held in all courts to be as valid and binding as if due service had been made upon the president or chief officer of such corporation."

The basic venue statute for actions against corporations is contained in K.S.A. 60-604:

"An action against a domestic corporation, or against a foreign corporation which is qualified to do business in this state, other than an action for which venue is otherwise specifically prescribed by law, may be brought in the county,

"(1) in which its registered office is located, or

"(2) in which the cause of action arose, or

"(3) in which the defendant is transacting business at the time of the filing of the petition, or

"(4) in which there is located tangible personal property which is the subject of an action for the possession thereof if immediate possession is sought in accordance with K.S.A. 60-1005 at the time of the filing of the action."

In the present case, venue in Ford County was proper under

K.S.A. 60-604(3). Although that statute may be limited by more specific statutes, K.S.A. 40-218 is not such a statute. K.S.A. 40-218 does not provide an exclusive statement of the permissible venues for actions against insurance companies but, instead, merely induces insurance companies to consent to actions in any district where the cause of action arose or where the plaintiff may reside. In so doing, it expands the otherwise valid venue alternatives listed in K.S.A. 60-604. Thus, K.S.A. 40-218 provides an additional permissive and cumulative venue alternative; it does not limit the venue alternatives provided by K.S.A. 60-604. See *Snelling v. Benefit Association*, 102 Kan. 227, 229-30, 169 Pac. 1144 (1918). In the present case, KBS has stipulated that it was transacting business in Ford County, Kansas, at the time the action began. Ford County was thus the proper venue for the present action under K.S.A. 60-604(3), and the district court properly denied KBS's motion for a change of venue.

In summary, we find that the district court properly denied defendant KBS summary judgment, but erred in granting the plaintiff summary judgment on the basis that Pratt came within the "director exclusion" as set out in § 2(d) of the bonds. The question of fact to be determined is whether the loss occurred as a result of acts committed by Pratt while acting as a member of either the discount or compliance committees. In view of our findings, it is not necessary to consider the other points raised by the defendant in this appeal.

The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.