No. 75,279

ASSOCIATED WHOLESALE GROCERS, INC., *et al.*, *Plaintiffs/Appellees*, v. AMERICOLD CORPORATION; SAFEWAY, INC., *et al.*, *Defendants*, and NORTHWESTERN PACIFIC INDEMNITY COMPANY, *Garnishee/Appellant*.

934 P.2d 65

Opinion filed March 7, 1997.

*Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, argued the cause, and *Charles R. Hay*, of the same firm, was with him on the briefs for garnishee/appellant.

*Andrew W. Horstman*, of Robins, Kaplan, Miller & Ciresi, of Minneapolis, Minnesota, argued the cause, and *Donald W. Bostwick*, of Adams, Jones, Robinson & Malone, of Wichita; *N. Jack Brown*, of Boddington & Brown, of Kansas City; and *David S. Evinger* and *Robert J. Gilbertson*, of Robins, Kaplan, Miller & Ciresi, of Minneapolis, Minnesota, were with him on the briefs for plaintiffs Arkwright Mutual Insurance Company; Doskocil Companies, Inc., for itself and as assignee of Industrial Risk Insurers; and Wilson Foods Corporation.

*John M. Duggan*, of Duggan, Shadwick & Doerr, P.C., of Kansas City, Missouri, argued the cause, and *John E. North, Jr.*, and *Pamela K. Black*, of McGrath, North, Mullin and Kratz, P.C., of Omaha, Nebraska, were with him on the briefs for ConAgra, Inc. and Swift-Eckrich, Inc.

*James A. Durbin* and *Richard N. Bien*, of Swanson, Midgley, Gangwere, Kitchin and McLarney, L.C., of Kansas City, Missouri, were on the briefs for Safeway, Inc.

*Edward J. Barbosa*, *William J. Gotfredson*, and *Edward L. Smith*, of Knipmeyer, McCann, Smith, Manz & Gotfredson, of Kansas City, Missouri, were on the briefs for Safeway, Inc.; Kraft Foodservice, Inc.; Fleming Companies, Inc.; and Marcus Phillips, d/b/a Phillips Confections, Inc., and Hanover Kansas City, Inc.

*Daniel J. Strausbaugh* and *Steffanie Stracke*, of Couch, Strausbaugh, Pierce & King, Chartered, of Overland Park, and *Laura A. Foggan, Daniel E. Troy*, and *John C. Yang*, of Wiley, Rein & Fielding, of Washington, D.C., were on the brief for *amicus curiae* Insurance Environmental Litigation Association.

*Steven C. Day*, of Woodard, Blaylock, Hernandez, Roth & Day, of Wichita, was on the brief for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

SIX, J.: This is a first impression pollution exclusion liability insurance excess coverage case involving a finding of bad faith for refusal to settle within policy limits. The judgments for plaintiffs totaled $58,670,754. The defendant excess carrier's policy limit is $25 million. Our journey to resolution takes us deep into "insurance country," where an unfamiliar landscape is dominated by both primary and excess carrier contractual relationships with the insured and the absence of case law controlling those relationships. Our vehicle is summary judgment.

## INTRODUCTION

Various tenants and their subrogated insurers (plaintiffs) sued Americold Corporation and its subsidiary, Americold Services Corporation (both called Americold), the owner and manager of an extensive underground cold storage facility. Plaintiffs in cases pending in both federal district court and the district court of Wyandotte County sought recovery for damaged food products. A fire starting on December 28, 1991, burned for several months and produced smoke spreading throughout the facility. Americold's primary general liability insurer, National Union Fire Insurance Company (National Union), provided Americold's defense. Plaintiffs sought damages of approximately $66 million.

For the year 1991, Americold had primary general liability coverage for tenant claims of $1 million, with $25 million excess coverage, through Northwestern Pacific Indemnity Company (NPIC), the garnishee-appellant, and $15 million excess coverage to the National Union and NPIC policies through TIG Insurance Company (TIG). The plaintiffs and their separate judgments are:

| | |
|---|---|
| Arkwright Mutual Insurance Company | $20,466,087.00 |
| Doskocil Companies, for itself and as assignee of Industrial Risk Insurers and Wilson Foods Corporation | $ 6,421,104.00 |
| Kraft Foodservice, Inc. | $ 4,930,373.00 |
| Safeway, Inc., and General Accident Ins. Co. | $ 5,283,027.00 |

| | |
|---|---|
| Fleming Cos., Inc., Commerce & Industry Ins. Co. and Institute of London Underwriters | $14,037,145.00 |
| Marcus Phillips d/b/a Phillips Confections and Hanover Kansas City, Inc. | $ 146,876.00 |
| ConAgra, Inc., and Swift-Eckrich, Inc. | $ 7,386,142.00 |

After extensive discovery, the parties participated in court-ordered settlement conferences (including both federal and state cases) before a federal magistrate. NPIC and TIG contended that various policy provisions, including an absolute pollution exclusion, raised coverage questions and declined to offer any amount in response to a policy limits settlement offer from plaintiffs. Concluding that NPIC and TIG were denying coverage, Americold negotiated a settlement with plaintiffs, which included consent judgments totaling $58,670,754, a covenant by plaintiffs not to execute against the assets of Americold, and an assignment of Americold's claims against its excess insurers. National Union tendered its policy limits on the eve of the settlement. Following entry of the consent judgments in the state and federal cases, plaintiffs filed garnishments in the district court of Wyandotte County against NPIC and TIG. After all parties moved for summary judgment, the district court denied NPIC's and TIG's motions and granted plaintiffs'. Both NPIC and TIG filed notices of appeal. TIG settled and dismissed its appeal. Our jurisdiction is under K.S.A. 20-3017 (motion by a party to transfer).

## THE ISSUES

The issues are: (1) Does the absolute pollution exclusion in the NPIC policy apply to eliminate coverage for plaintiffs' claims; (2) did plaintiffs carry their burden of proof that their damages resulted from an "occurrence" within the NPIC policy period and that the "other insurance" provision in the NPIC policy was satisfied; (3) is NPIC bound by the $58,670,754 settlement agreement reached by Americold and plaintiffs or, on summary judgment, do material issues of fact remain as to the reasonableness and good faith of the agreement; (4) did the district court improperly impose

bad faith liability on NPIC for damages above policy limits; and (5) did the district court improperly increase the amount of the judgment after entering summary judgment against NPIC?

We hold:

ISSUE (1): The absolute pollution exclusion in the NPIC policy does not exclude coverage.

ISSUE (2): The occurrence issue was not advanced in the district court and is not properly before us on appeal. NPIC failed to raise any material issue of fact regarding application of the other insurance provision.

ISSUES (3 and 4): Material issues of fact remain concerning: (1) the reasonableness of the policy limits settlement offer, (2) the reasonableness of the Americold settlement agreement, and (3) NPIC's bad faith liability in denying coverage and refusing to settle within the policy limits.

ISSUE (5): Because of our disposition of Issues (3) and (4), we do not reach Issue (5).

## FACTS

Americold's underground facility, a former limestone quarry located in Kansas City, Kansas, covers approximately 170 acres. The facility consists of two main areas, Portals A and B, separated by various walls and roadways. Americold Corporation is in the warehouse and cold storage business. Americold Services Corporation operates the facility under a lease. Besides containing areas leased to tenants, the facility also provided records storage and warehousing. Plaintiffs are either tenants leasing space in Portal B for food product storage or their subrogated insurers.

During the early morning hours of December 28, 1991, a fire was detected in Portal A. The local fire department's efforts to extinguish the fire were unsuccessful. The fire continued to burn and generate toxic smoke over the next several days. Americold hired a firm to seal Portal A to keep smoke from entering Portal B, and to pump carbon dioxide into Portal A to extinguish the fire. The fire was believed to be extinguished on January 10, 1992, and Portal A was vented. However, after venting, the fire burned for another 4 months, remaining within Portal A. Smoke spread into

Portal B, contaminating plaintiffs' food products. Some products may have been moved in and out of Portal B before January 9, 1992, the date the Kansas Department of Health and Environment placed an embargo on goods stored in Portal B. Testing confirmed that products in Portal B were contaminated with many toxic substances.

Americold notified NPIC of the fire on December 31, 1991. NPIC assigned Melba Lynn as the claims representative, and on January 2, 1992, retained Wallace, Saunders, Austin, Brown and Enochs, Chtd., (Wallace, Saunders) as coverage counsel to monitor the situation.

Lynn prepared a "Claim Abstract" dated January 2, 1992, which noted: "estimated 200 million in values inside cave. Possible pollution exposure." Lynn notified National Union on January 7, 1992, that NPIC's policy "has a $25 million limit in excess of your $1 million primary general liability coverage." The letter (copied to Americold) noted that there may be "coverage issues" and requested a copy of National Union's coverage position, stating: "Your immediate attention will allow us to take a prompt and accurate coverage position." The letter further requested that Lynn be copied on all correspondence and investigative materials and suggested that National Union "provide these same materials" to TIG, the other excess carrier "because of the potential for multi-million dollar claims." During January 1992, NPIC informed Americold that if National Union did not investigate or defend, NPIC would assume those duties.

On January 14, 1992, Lynn requested that Americold's counsel, Paul Niewald, send her copies of the tenant leases and certificates of insurance. Niewald complied. Lynn was interested in the tenants' obligations to maintain liability coverage listing Americold as an additional insured. Lynn discussed the leases with counsel. She requested that Americold make claims for liability coverage under the leases, because most showed a mutual waiver of subrogation and required Americold to be listed as an additional insured on tenants' liability policies.

In January 1992, Niewald's firm prepared a memorandum analyzing available insurance coverages for the fire loss. The memo-

randum anticipated that the excess general liability carriers might raise the absolute pollution exclusion as excluding coverage for smoke damage, but concluded: "In our opinion, the excess carriers would be on shaky ground in attempting to deny coverage for smoke or soot damage to lessees' property." The memorandum further concluded that general liability coverage of $41 million under the National Union, NPIC, and TIG policies should be available for tenant claims.

Beginning in April 1992, various lawsuits were filed against Americold and eventually consolidated in both federal and state court. Claimants generally included record storage customers, warehouse bailors, and tenants at the facility.

National Union initially denied coverage for two lawsuits filed against Americold in state court. On May 27, 1993, Americold filed a declaratory judgment action against National Union to resolve the coverage issues. However, the declaratory judgment action remained dormant. During mid-1993, National Union paid out $33,000 to settle a claim, which Americold viewed as an admission that coverage existed.

Lynn wrote National Union on December 9, 1992:

"To date, we have not received a response to our inquiries regarding your investigation nor your coverage position. We trust you recognize your duties and responsibilities as the primary carrier to both Americold and to our company. Your delays, without adequate explanation nor a definite time for accomplishing these requests, may constitute a breach of your duty to Americold and our company."

On the same date, Lynn wrote to Americold: "[O]n two previous occasions we have written to the primary insurance company and requested information from them, including their coverage position. As you know, their position on coverage directly effects [sic] your coverage under our policy of insurance."

In response, Niewald wrote to Lynn on December 11, 1992: "We certainly expect our liability insurance companies to appropriately investigate this matter and to give full details of any information which would cause them to believe that coverage is not available."

On March 15, 1993, Lynn reiterated to National Union, NPIC's concern that National Union accept defense of the pending law-

suits against Americold. Lynn also suggested that some litigation might be disposed of if tenants making claims had named Americold as an additional insured under their own insurance policies, thus possibly preventing a subrogated insurer of a tenant from making a claim against its own insured, Americold.

National Union eventually retained the firm of Armstrong, Teasdale, Schlafly & Davis (Armstrong, Teasdale) to represent and defend Americold under a reservation of rights against the tenants' liability claims. Other liability insurers and law firms were involved in defending Americold against the warehouse and records storage claims. Lynn routinely received reports prepared by Douglas Richmond, an attorney with Armstrong, Teasdale, concerning the fire investigation and the pending tenant lawsuits.

In April 1993, David Bissell of NPIC took over the Americold file. Bissell recognized the potential for excess damages being awarded against Americold and thought coverage litigation was a strong possibility.

By June 1993, Bissell concluded that the pollution exclusion in the NPIC policy probably applied to foreclose coverage for claims arising from smoke damage at the Americold facility. However, relying on advice of counsel, Bissell did not believe that NPIC was obligated to reveal its coverage position to Americold unless NPIC took control of the defense.

Richmond's status reports show that the fire investigation and discovery proceeded at an intense pace during 1992 and 1993. Although Richmond attempted to be positive, it became apparent that Americold had serious defense problems. For example, Richmond observed in one of his reports regarding expert depositions: "The experts retained by our co-counsel were ill prepared, lacked knowledge about the facility or the facts of this case." He opined that two experts "made terrible appearances as witnesses," and concluded generally that "the witnesses engaged by our co-counsel embarrassed us and Americold."

The origin of the fire remained in dispute. Plaintiffs contended that the fire started in an area controlled by Americold, possibly from exploding dust after rock fell from the ceiling onto bags of powdered milk. Americold claimed that the fire started on the

premises of Return, Inc., one of its tenants in Portal A. Plaintiffs claimed that, despite where or how the fire started, Americold was negligent in at least the following respects: (a) The facility violated applicable codes, had no sprinkler system, had an inadequate fire alarm system, had improper firewall openings, and lacked a ventilation system that could have prevented the smoke from spreading throughout the facility; (b) Americold employees were not properly trained in dealing with cave fires, and after first detecting the fire, failed to notify the fire department for almost an hour; and (c) the contractor retained by Americold to extinguish the fire exacerbated the smoke contamination problem with its use of carbon dioxide in unsuccessful attempts to extinguish the fire and seal off Portal A.

The leases generally had exculpatory "hold harmless" clauses applying to Americold Services Corporation, as landlord, except for gross negligence. Also, some leases provided for waiver of subrogation claims, under certain circumstances, for damages covered by the tenant's property insurance. However, only Americold Services Corporation was a party to the leases. Americold Corporation may not have been protected by this exculpatory language. Also, the evidence could have been sufficient to surpass the gross negligence hurdle.

On November 5, 1993, Richmond received a settlement demand from a group of plaintiffs (including Arkwright Mutual Insurance Company, as subrogated insurer of Swift-Eckrich; Wilson/Doskocil and IRI; Fleming; Safeway; and Kraft) for Americold's general liability insurance policy limits of $41 million, which offer was to remain open until November 24, 1993. Richmond forwarded the offer to Bissell, along with Richmond's letter to National Union containing his observations. Richmond commented: "I expect that within the next several months, or at least by February 1, 1994, Mr. Niewald will demand on behalf of Americold that this case be settled for policy limits."

In December 1993, upon Richmond's recommendation, National Union retained Arthur Andersen & Co. to evaluate plaintiffs' damage claims. On December 16, 1993, Richmond advised Bissell of a favorable decision in federal court, *Butler Mfg. Co., Inc. v.*

*Americold Corp.*, 841 F. Supp. 1107 (D. Kan. 1993), upholding certain exculpatory language in the leases. Richmond noted that plaintiffs would be required to prove gross negligence to overcome that language. On January 3, 1994, three plaintiffs filed a motion to amend their petitions to claim punitive damages against Americold.

Richmond forwarded to Bissell in November and December 1993, detailed settlement demands from Safeway for $5,930,650, Kraft for $5,634,726, Arkwright, as subrogated insurer of Swift-Eckrich, for $22,923,342, IRI, as subrogated insurer of Doskocil/Wilson, for $7,875,641, and Fleming for $16 million.

Paul Hasty, of Wallace, Saunders, informed Richmond on January 3, 1994, that NPIC had retained Hasty's firm in the Americold matter. Hasty's letter also requested that Richmond provide him information and documents relating to whether Americold was pursuing claims against its tenants' liability insurance carriers for coverage as an additional insured.

Bissell requested that Richmond come to Dallas to brief Bissell, Hasty, and other NPIC officials on the Americold case. In preparation for the January 21, 1994, Dallas meeting, Richmond sent Bissell a "Damages Summary & Analysis—Lease Plaintiffs," which listed the damages claimed by each tenant, all totaling $66,045,987.85. The summary also noted that several motions for partial summary judgment were pending and that trial in the federal cases was scheduled for April 5, 1994.

TIG's counsel, in a January 11, 1994, letter to Hasty, demanded a coverage position from NPIC. Hasty replied on January 18, 1994: "National Union . . . continues to defend those claims that may be indemnifiable under their contract. Furthermore, the primary limits have not been exhausted by payment of claims or satisfaction of judgments which would trigger [NPIC's] duties under its policy. Therefore, I believe your request for a 'coverage position' is premature."

Hasty continued his requests to Richmond for information and discovery regarding the possibility of Americold pursuing counterclaims for coverage under plaintiffs' liability insurance policies.

On February 4, 1994, Richmond received a revised settlement proposal for the policy limits from counsel for all plaintiffs, except Swift-Eckrich, allowing Americold to carve out a sufficient reserve to defend against Swift-Eckrich's claim for approximately $7 million. By letter of January 31, 1994, Richmond furnished Bissell an updated settlement demand for the policy limits. This offer was to remain open until February 15, 1994. Richmond forwarded the offer to National Union, NPIC, and TIG, noting:

"Americold believes quite strongly that a counteroffer in the $20,000,000 range must be made before the plaintiffs' existing February 15th deadline. Americold believes quite strongly that any offer below $20,000,000 will be viewed as a sign of bad faith by the plaintiffs and impair or impede further attempts at settlement, perhaps to everyone's detriment if [federal District Court] Judge Lungstrum ultimately rules against us at the end of next week [on the pending summary judgment motions]. It is Americold's opinion that the lease claims can be settled for between $20,000,000 and $25,000,000 and should be so settled as soon as possible."

Richmond recommended settlement.

At a February 7, 1994, status conference in the federal cases, the judge announced that the trial would be bifurcated, with liability to be tried first and then damages. The liability phase was scheduled to start on April 12, 1994. Pending summary judgment motions were to be ruled on by February 18 or 21, and a pretrial conference was scheduled for March 10, 1994.

On February 10, 1994, Niewald, on behalf of Americold, demanded that Americold's insurers settle plaintiffs' claims within the coverage afforded. Richmond wrote Bissell on February 10, 1994, about his concern that Hasty "seems to be attempting to influence defense strategy while, at the same time, serving as coverage counsel." Richmond said further: "Americold does not believe it proper for Mr. Hasty to wear both coverage and defense hats at the same time, nor is it proper for [NPIC] to direct him to do so."

On February 16, 1994, Hasty stated NPIC's coverage position, which raised coverage defenses, including, among others: (a) the absolute pollution exclusion bars coverage for smoke damage, and all lease space claims appear to have arisen from such damage; (b) underlying coverage must be exhausted before NPIC coverage ap-

plies; and (c) because Americold may have waived compulsory counterclaims for coverage under the liability insurance policies of its tenants, this may constitute a breach of the NPIC policy. The letter did not expressly say that coverage was denied.

Niewald promptly responded to Hasty's February 16, 1994, coverage letter by sending to Bissell a copy of a brief addressing the pollution exclusion. The brief emphasized that such an exclusion was never intended to apply to smoke damage from a hostile fire. Niewald followed with a letter dated February 25, 1994, stating: "We need your prompt advices as to whether the company will withdraw its denial of coverage." Niewald warned that should the coverage denial remain, Americold would seek indemnification against NPIC for any judgment against Americold.

Hasty continued to request tenant liability policy information from Richmond and to ask whether Americold was pursuing counterclaims for liability coverage. Richmond sent copies of the insurance policies of some plaintiffs to Bissell, but stated in his letter of February 22, 1994, that Americold did not believe NPIC was excess to any of those policies.

The court-ordered settlement conferences continued for a total of 5 days, February 18-19 and March 8-10. Bissell and Hasty attended. However, Niewald objected to Hasty's participation because of Niewald's perception of a conflict of interest from Hasty's involvement in both NPIC coverage issues and Americold liability issues. During the settlement conferences, some plaintiffs produced copies of their insurance policies, which were given to Hasty. At the second settlement conference, all plaintiffs offered settlement within the policy limits. On March 9, 1994, National Union said that it would pay out the balance of its policy limits. Neither NPIC nor TIG tendered any amount toward settlement.

Niewald repeated Americold's demand that the lease claims be settled within the policy limits. On March 10, 1994, Hasty responded on behalf of NPIC, acknowledging that National Union advised him on the evening of March 9, 1994, that its policy limits had been exhausted. However, NPIC would neither admit nor deny that there was any coverage. NPIC offered to defend Americold under a reservation of rights (although no reservation of rights

letter had yet been issued), which Americold declined. Niewald advised NPIC and TIG that he would be attempting to negotiate a settlement on behalf of Americold with plaintiffs, without the involvement of NPIC or TIG.

On March 10, 1994, Americold and plaintiffs agreed to settle the lease claims for consent judgments totaling $58,754,574, contingent on plaintiffs' investigation of Americold's ability to pay any judgment. The agreement was completed in the summer of 1994. Americold dismissed its counterclaims and assigned its claims against NPIC and TIG for excess coverage and any bad faith to plaintiffs, in return for plaintiffs' covenant not to execute against Americold. In the agreement, Americold represented its financial condition as follows:

"5.1 Substantially all of Americold's assets are held as collateral by Americold's secured creditors and Americold's indebtedness to its secured creditors exceeds the value of all Americold assets by at least $50 million. . . .

"6.1 . . . . Americold represents to Plaintiffs that it has a negative net worth and that Americold is now an operating corporation, capable of servicing its debt load, but a judgment not covered by insurance or in excess of its insurance limits would make it unable to service its debt, trigger default provisions in the debt instruments on its secured assets, and jeopardize the viability of the company."

On March 15, 1994, NPIC filed a declaratory judgment action in the district court of Johnson County against Americold and plaintiffs. The action sought a declaration that: (1) the NPIC policy provided no coverage, (2) NPIC had no duty to defend or indemnify Americold for the pending lease claims, and (3) if any coverage existed, it was excess to any coverage available to Americold under the tenant liability insurance policies.

On April 11, 1994, NPIC, through Hasty, formally offered to defend under a lengthy reservation of rights.

In September 1994, after consent judgments were entered and registered, plaintiffs commenced garnishment proceedings against NPIC and TIG. Venue of NPIC's declaratory judgment action was transferred to the district court of Wyandotte County and dismissed. The district court found that the declaratory judgment issues could be litigated in the pending garnishment actions. Depositions of various persons, including Lynn, Bissell, and Niewald,

were taken. Plaintiffs moved for summary judgment against NPIC and TIG in June 1995. NPIC responded with four motions for summary judgment, claiming: (1) the absolute pollution exclusion precluded coverage; (2) the settlement agreement between Americold and plaintiffs entered into without NPIC's consent violated the NPIC policy provisions; (3) NPIC is not liable over the $25 million policy limit; and (4) the tenants' liability insurance is primary to NPIC coverage. TIG also moved for summary judgment.

The district court denied the summary judgment motions of NPIC and TIG and granted summary judgment for plaintiffs, finding that judgments totaling $25 million should be entered in favor of plaintiffs and against NPIC for its policy limits. Additionally, NPIC was held jointly and severally liable with TIG for judgments totaling $33,670,754, plus statutory interest from the dates plaintiffs obtained their judgments against Americold after the settlement.

After filing its appellate brief, TIG settled with plaintiffs/garnishors for its policy limits of $15 million and dismissed its appeal. Before oral argument, NPIC, Arkwright, and Doskocil filed a joint motion in this court requesting remand to permit the district court to vacate Arkwright's and Doskocil's judgments totaling $26,887,191. The remaining nonsettling plaintiffs objected and filed a motion to dismiss this appeal. We granted the motion to remand and denied the motion to dismiss. The Arkwright and Doskocil judgments against NPIC were vacated by the district court on January 2, 1997.

## DISCUSSION

Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. K.S.A. 60-256(c). Our standard of review is de novo. See *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 250 Kan. 754, Syl. ¶ 2, 863 P.2d 355 (1992). Although the essential facts have not been formally stipulated, they are documented in correspondence between the parties. Our standards in reviewing summary judgment are well established. See, *e.g.*, *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995).

We are apprehensive, under these facts, to affirm summary judgment bad faith liability for damages above policy limits. NPIC made an oral offer to defend under a reservation of rights after National Union exhausted its limits. The impact on the issues in controversy of NPIC's offer to defend and of its other actions remain for district court consideration on remand.

### The National Union and NPIC Insurance Policy
### Pollution Exclusions

The National Union policy pollution exclusion eliminates coverage for " 'property damage' arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants," which are defined to include "smoke" and "soot."

National Union's policy also contains a "hostile fire" endorsement, entitled "Amendment of Pollution Exclusion":

"[The pollution exclusion provisions] *do not apply to 'bodily injury' or 'property damage' caused by heat, smoke or fumes from a hostile fire.* As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be." (Emphasis added.)

The parties agree that the fire in Portal A was hostile. NPIC admits that liability for heat or combustion damage from a hostile fire would be covered under NPIC's general liability policy provisions, but claims its pollution exclusion precludes coverage for smoke damage. The concepts of "friendly fire" and "hostile fire" are discussed in *Youse v. Employers Fire Ins. Co.*, 172 Kan. 111, 117, 238 P.2d 472 (1951). In seeking to avoid liability on the ground that the injury is covered under an exception to the general terms of its policy, NPIC has the burden of proving facts bringing this case within the exception. *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, Syl. ¶ 4, 522 P.2d 401 (1974).

The NPIC policy contains several pollution exclusions. NPIC relies on "Endorsement No. 5," which provides in part:

"It is our intent to exclude any and all coverage for any claim, suit, liability, defense costs, expenses and settlement arising directly or indirectly out of pollution whether or not the pollution was sudden, accidental, gradual, intended, expected, unexpected, preventable or not preventable."

Endorsement No. 5 also defines smoke as a pollutant. The NPIC policy contains no hostile fire amendment.

This case focuses on NPIC's Coverage A, entitled "Excess Follow Form Liability Over Claims Made or Occurrence Coverage," which applies to "damages in excess of the total Limits of Liability of Underlying Insurance as stated in the Schedule of Underlying Insurance." The Schedule of Underlying Insurance lists the National Union policy with a liability limit of $1 million for commercial general liability coverage per "Occurrence."

### District Court Ruling—The Pollution Exclusion

The district court decided that NPIC's pollution exclusion did not preclude coverage, emphasizing the correspondence from NPIC and TIG to Americold and the reasonable belief of Americold that the NPIC policy followed form with the National Union policy on the hostile fire amendment. The district court also found the language of the pollution exclusion ambiguous, as a matter of law, reasoning that although a plain reading of the exclusion is "subject to an interpretation that coverage of [smoke damage] is barred," "common sense" requires a finding that "smoke directly emitted from a hostile fire, admittedly causing damage to property, would be covered as fire damage."

### Pollution Exclusion Analysis

NPIC argues that the rule of strict construction against the insurer should not apply because the coverage dispute is primarily between insurance companies. We do not agree that we should abandon strict construction. Although some plaintiffs are subrogated insurers, they bring their claims in the shoes of Americold under the settlement agreement assignment.

NPIC challenges the applicability of the "reasonable expectations" doctrine, arguing that it applies only if the policy is first determined to be ambiguous. NPIC also disputes the district court's common sense interpretation of the pollution exclusion, reasoning that if the meaning of the policy language is clear, the reasonable expectations doctrine does not apply, citing *Penalosa Co-op. Exchange v. Farmland Mut. Ins. Co.*, 14 Kan. App. 2d 321,

324, 789 P.2d 1196, *rev. denied* 246 Kan. 768 (1990) (see *Penalosa Coop. Exchange*, 14 Kan. App. 2d at 323-24, for a summary of the rules of construction applicable to insurance policies).

NPIC asserts that the district court adopted reasoning rejected in *Crescent Oil Co. v. Federated Mut. Ins. Co.*, 20 Kan. App. 2d 428, 433, 888 P.2d 869 (1995), that the pollution exclusion applies only to "active intentional industrial pollution." The district court did not so limit application of the NPIC pollution exclusion. It found that the exclusion language was ambiguous when applied to a hostile fire situation, stating:

"This Court cannot comprehend how a reasonable person, insuring his dwelling or building, would knowingly agree to buy insurance protection for damage by fire while fully realizant that any damage from smoke from that fire, such as to curtains, upholstery, etc., would not be covered."

NPIC points out that here, language in a third-party general liability policy, not a first-party fire insurance policy, is at issue. Yet the same question is raised in either context: Why would anyone seeking general liability insurance for commercial property knowingly purchase a policy that covered liability for hostile fire damage but excluded smoke damage from the fire?

NPIC disputes application of the National Union hostile fire amendment to NPIC coverage. The NPIC policy provides that terms and conditions of the National Union policy are part of the NPIC policy as to Coverage A, "except for" the items listed in subparts "a" and "b." Subpart "a" includes the duty to investigate and defend, the limits of liability, premium, cancellation, other insurance, NPIC's right to recover payment, and the extended reporting periods. Subpart "b" includes "any renewal agreement, and any exclusion or limitation attached to [the NPIC] policy by endorsement or included in the Exclusions applicable under Coverage A . . . of [the NPIC] policy." With respect to subparts "a" and "b", "the provisions of [the NPIC] policy will apply."

Ambiguity surrounds the question of whether the hostile fire amendment was deleted from the NPIC coverage. The term "except for" could mean "not including." Thus, the hostile fire amendment—which is a term or condition of National Union's policy—

is part of NPIC's coverage agreement unless it is found in subparts "a" or "b." Subpart "a" lists specific portions of the National Union policy deleted from NPIC's "excess follow form" coverage, but the hostile fire amendment is not on that list. Subpart "b," which unlike subpart "a" does not refer to the National Union policy, also does not refer to the hostile fire amendment. National Union's hostile fire amendment is not a renewal agreement, is not an exclusion or limitation (since it serves only to clarify the scope of an exclusion or limitation, not to exclude or limit anything new), and is not "attached to [NPIC's] policy."

NPIC contends that its pollution exclusion controls over the National Union pollution exclusion and hostile fire amendment, citing *Home Ins. Co. v. American Home Products Corp.*, 902 F.2d 1111 (2d Cir. 1990). *Home Ins. Co.* decided that the terms, conditions, and exclusions in the second-level excess "following form" policy controlled over any conflicting provisions in the first-level excess policy. The NPIC policy does not contain language saying that the NPIC terms, conditions, and exclusions control over conflicting or inconsistent National Union policy provisions. The NPIC Coverage A language does not clearly disclaim, delete, or override the National Union hostile fire amendment.

An insurer "assumes a duty to define any limitations on . . . coverage in clear and explicit terms." *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 698, 840 P.2d 456 (1992). NPIC could have used language to clarify that the hostile fire amendment would not apply (*i.e.*, the terms of the National Union policy are included unless they are inconsistent with other provisions in the NPIC policy, or the NPIC policy will not apply to certain items such as pollution, despite coverage afforded in the National Union policy). See *Coleman Co., Inc. v. California Union Ins. Co.*, 960 F.2d 1529, 1534 n.9 (10th Cir. 1992) ("We note that the 'following form' provision at issue here, as modified, contains no [exception similar to *Home Ins.*, 902 F.2d at 1113,] for terms and conditions that are inconsistent with the umbrella policy.").

NPIC also argues that even if the hostile fire amendment in the National Union policy applied to the NPIC policy, the burden of proof shifted to plaintiffs to establish that the exception to the

pollution exclusion applied. NPIC contends plaintiffs failed to meet this burden because the hostile fire amendment was limited only to damage from "heat, smoke or fumes," and consequently is not broad enough to include damages from any pollutants from a hostile fire. No one disputes that the contamination of plaintiffs' products came from anything other than the smoke. NPIC's attempt to draw a distinction between smoke and the toxic materials contained in the smoke is not persuasive.

We agree with the district court that the "release or escape of pollutants" language in NPIC's pollution exclusion is also ambiguous. The reasonable expectations doctrine applies. See *Farm Bur. Mut. Ins. Co. v. Winters*, 248 Kan. 295, 300, 806 P.2d 993 (1991) ("[T]he test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean."). See *Regional Bank of Colo. v. St. Paul Fire & Marine*, 35 F.3d 494, 498 (10th Cir. 1994) (Insurer unsuccessfully raised the pollution exclusion as a coverage defense against an apartment tenant's injury claim from carbon monoxide poisoning caused by a faulty heater. The court noted the unreasonableness of a policy interpretation that would provide coverage for injury caused by fire from the faulty heater but not to a victim injured by carbon monoxide emissions from the same heater.).

The NPIC policy followed form to the National Union policy and did not clearly delete National Union's hostile fire amendment. The pollution exclusion language in the NPIC policy is ambiguous when applied to these facts. NPIC's policy is interpreted to include coverage for damage caused by smoke from a hostile fire.

We do not find the pollution exclusion cases cited by NPIC convincing: In *Employers Cas. v. St. Paul Fire and Marine*, 52 Cal. Rptr. 2d 17 (Cal. App. 1996) the California Supreme Court, on July 17, 1996, ordered the opinion withdrawn from publication and that it not be cited as authority. In *Beahm v. Pautsch*, 180 Wis. 2d 574, 510 N.W.2d 702 (Ct. App. 1993), smoke from the insured's pasture burn-off became uncontrollable, obscuring motorists' vision. The insurer raised the pollution exclusion, but the court decided coverage existed, reasoning that the harm caused by the

smoke was not from the toxicity of the smoke as an "irritant, contaminant, or pollutant." 180 Wis. 2d at 584-85. We acknowledge the harm in *Beahm* resulted from smoke as a semi-opaque substance, not from toxic properties. *Beahm* held the pollution exclusion did not apply. The toxicity language is dicta.

In *Reliance Ins. Co. v. Kent Corp., Inc.*, 896 F.2d 501, *opinion vacated by settlement* 909 F.2d 424 (11th Cir. 1990), the insurer asserted it had no obligation to defend the insured for liability from injuries sustained by firemen because of a dumpster fire on the insured's premises. Hazardous waste containers (including a 5-gallon can of Toluol) were found in the dumpster after the fire. The Court of Appeals reversed the district court's summary judgment for the insurer, holding that the absolute pollution exclusion would exclude coverage for emissions from hazardous waste containers during a dumpster fire. If the firemen were in fact injured by the release of hazardous gases from the dumpster containers, coverage would be excluded. 896 F.2d at 503. However, the evidence was conflicting about whether any hazardous gases were actually released during the fire. Here, the Americold Portal A fire did not involve the release of any known hazardous materials from containers, as in *Reliance Ins. Co.* Smoke from Portal A spread throughout the facility, and the toxic chemicals were part of the smoke.

*Donaldson v. Urban Land Interests, Inc.*, 205 Wis. 2d 404, 556 N.W.2d 100 (Ct. App. 1996), and *Cook v. Evanson*, 83 Wash. App. 149, 920 P.2d 1223 (1996), are cases in which courts have found the pollution exclusion unambiguous in the applicable factual context. Neither involved hostile fire smoke damage situations. The pollution exclusion cases cited by *amicus curiae* Insurance Environmental Litigation Association are in the same category.

We need not reach plaintiffs' argument that coverage should exist under the waiver and estoppel doctrines.

## "Occurrence" within the NPIC Policy Period

Although the fire began during the coverage period, NPIC contends that questions of fact exist as to the date of the occurrence and whether the claim falls within NPIC's coverage (January 1,

1991, to January 1, 1992, 12:01 a.m.). According to NPIC, issues of fact as to damages arise because goods were allowed to move in and out of the facility during 1992 before the embargo was imposed on January 9, 1992.

Plaintiffs respond that NPIC failed to contest the coverage period in the district court and consequently the issue is not properly before us on appeal. We agree. The *In re Conservatorship of Marcotte*, 243 Kan. 190, 196, 756 P.2d 1091 (1988), exceptions are not applicable.

NPIC concedes that it did not argue the "occurrence" issue in the summary judgment motions, but claims the issue was raised in Hasty's February 16, 1994, letter and in NPIC's declaratory judgment petition. NPIC's unverified amended petition filed in Johnson County in March 1994 alleged:

"[S]ome of the claims against the defendants, Americold Corporation and Americold Services Corporation, by the defendants, [listing names], arose from events and occurrences after 12:01 a.m. on January 1, 1992, and therefore, Exhibit A [the NPIC policy] provides no coverage to Americold Corporation and/or Americold Services Corporation for any claims against them for damaged property as the result of pollution, including but not limited to pollution by smoke, vapor, soot, fumes and other irritants and contaminants as specifically set forth in the pollution exclusion of Exhibit A, which is incorporated, verbatim, by reference."

Although that allegation mentions "events and occurrences" after the 1991 coverage period, no specific events or occurrences are alleged. NPIC's declaratory judgment action was dismissed several months before the summary judgment motions in this case were heard and decided.

The occurrence issue is not properly before us.

### "Other Insurance" and the Tenant Liability Policies

NPIC also claims that because tenant leases required Americold Services Corporation to be named as an additional insured on tenant liability policies, coverage under those policies should be primary to NPIC coverage. The tenant policy endorsements afford liability coverage to the landlord for property damage claims incurred in ownership or use of the leased premises.

As the landlord, Americold Services Corporation, not Americold Corporation, was named as an additional insured in the tenant leases. As the owner of the facility and employer, Americold Corporation was the target defendant, not Americold Services Corporation.

The NPIC "Other Insurance" provision stated: "If other insurance applies to claims covered by this policy, the insurance under this policy is excess and we will NOT make any payments until the other insurance has been used up." The term "other insurance" means: "Insurance other than Scheduled Underlying Insurance or insurance specifically purchased to be excess of this policy affording coverage that this policy also affords."

Plaintiffs contend that to the extent Americold Services Corporation had any coverage under the tenant liability policies, it would apply only to events occurring on the leased premises and attributable to tenants' operations. Because the fire was in Portal A, away from plaintiffs' leased premises in Portal B, plaintiffs contend that the tenant liability coverage would not apply to Americold Services Corporation.

NPIC argues: (1) plaintiffs' damage claims were incurred in the use or ownership of their leased premises; (2) the smoke damage occurred on the leased premises of each plaintiff; and (3) the tenants' policy endorsements do not impose a requirement that the source of the damages must originate on the leased premises or be attributable to the tenants' own conduct.

We agree with plaintiffs. See *Harvey v. Mr. Lynn's, Inc.*, 416 So. 2d 960, 962 (La. App. 1982) ("[Owners', landlords', and tenants' liability insurance] coverage properly pertains only to those claims which arise out of the ownership, maintenance, or use of the insured premises and all operations necessary or incidental to such ownership, maintenance, or use." A modelling agency's policy did not provide liability coverage for personal injury claim of model injured in fall during modelling show at a different location away from the agency's premises.); *Federal Ins. Co. v. Commerce & Industry Ins. Co.*, 187 App. Div. 2d 278, 279, 589 N.Y.S.2d 439 (1992) ("The only rational interpretation of the policy is that the landlord was afforded liability coverage for third-party actions

based on landlord's vicarious liability for the tenant's acts." Insurer of tenant's contents in warehouse was held not required to defend landlord against tenant's damage claim for roof leak when landlord was additional insured under tenant's policy.). NPIC has not shown the existence of any valid coverage for Americold under any of plaintiffs' liability policies. NPIC failed to present sufficient evidence raising any material issues of fact as to whether coverage under any other tenant liability policies existed.

### Is NPIC Bound by the Settlement Agreement Between Plaintiffs and Americold?

We view the impact of the Americold settlement agreement on NPIC through the procedural lens of summary judgment. Are there material issues of fact remaining concerning the reasonableness and good faith of the agreement? The answer is, "Yes."

NPIC is an excess carrier. National Union provided primary coverage.

"Primary insurance coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. [Citation omitted.] An excess policy is one that provides that the insurer is liable for the excess above and beyond that which may be collected on primary insurance. [Citation omitted.] In a situation in which there are primary and excess insurance coverages, the limits of the primary insurance must be exhausted before the primary carrier has a right to require the excess carrier to contribute to a settlement. [Citations omitted.] In such a situation, the various insurance companies are not covering the same risk; rather, they are covering separate and clearly defined layers of risk. The remote position of an excess insurer thus greatly reduces its chance of exposure to a loss. This reduced risk is generally reflected in the cost of the excess policy." *Union Indem. Ins. Co. v. Certain Underwriters*, 614 F. Supp. 1015, 1017 (S.D. Tex. 1985).

"Simply stated, the primary policy provides 'first dollar' liability coverage up to the limits of the policy." Marick, *Excess Insurance: An Overview of General Principles and Current Issues*, 24 Tort & Ins. L.J. 715, 716 (1989). "The primary insurance carrier is obligated not only to pay on behalf of the insured settlements and judgments, but also owes its insured a duty to defend under most policies." Marick, 24 Tort & Ins. L.J. at 716. Primary coverage is much more expensive than excess coverage. (The annual premium

for NPIC's $25 million excess coverage was $121,500; for National Union's $1 million primary coverage, it was $232,077.)

Before National Union tendered its policy limits, NPIC was not obligated to defend Americold or to take charge of settlement efforts on behalf of Americold. National Union had assumed Americold's defense. However, an excess insurer owes an implied good faith obligation regarding settlement negotiations. See *Diamond Heights Homeowners Assn. v. National American Ins. Co.*, 227 Cal. App. 3d 563, 277 Cal. Rptr. 906, (1991), *rev. denied* May 16, 1991.

Even when it has not assumed the defense or control of settlement negotiations, an excess insurer has the right under the policy to consent to any settlement reaching its coverage level. The excess insurer has an implied obligation to exercise that right in good faith. See 1 Windt, Insurance Claims & Disputes § 5.26, p. 350 (3d ed. 1995) ("The duty [of an excess insurer] to settle exists independently of the duty to defend."). See also Ashley, Bad Faith Actions—Liability and Damages § 6.21 (1992) ("When an insured has both primary and excess liability insurance coverage, he can expect the excess carrier to respond to settlement offers with the same good faith required of primary carriers." [Citing *Kelley v. British Coml. Ins. Co.*, 221 Cal. App. 2d 554, 34 Cal. Rptr. 564 (1963)]).

We discussed the scope of an insurer's settlement duty to the insured in *Bollinger v. Nuss*, 202 Kan. 326, Syl. ¶¶ 1-4, 449 P.2d 502 (1969). *Bollinger* is neither an excess carrier nor a coverage denial case. It concerned a claim against a liability insurer that refused to settle a third-party claim within policy limits before trial. The verdict against the insured was over the policy limits. We found neither negligence nor bad faith in refusing to settle.

Here we are concerned with more complex events. NPIC refused to settle within the policy limits because of coverage denial. Coverage denial was followed by an agreement between third-party claimants and Americold for consent judgments against Americold over policy limits, coupled with a covenant not to execute against Americold. Although *Glenn v. Fleming*, 247 Kan. 296, 799 P.2d 79 (1990), did not involve a prejudgment settlement between the insured and third-party claimant, we approved of such settlements: "A nonjury verdict judgment may be enforced against an insurer

contingent upon proving bad faith or negligence in a refusal to settle. The assignment/covenant not to sue may be utilized if the judgment is reasonable in amount and entered into in good faith." 247 Kan. at 318. We cautioned: "We do express concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties." 247 Kan. at 318. The test in *Griggs v. Bertram*, 88 N.J. 347, 368, 443 A.2d 163 (1982), was adopted to address that concern. 247 Kan. at 318-19. We decided in *Glenn* that the offer to settle for policy limits was unreasonable, so we did not need to address whether the excess judgment was enforceable against the insurer. We reasoned:

"Emphasis should be placed on the recognition that an insurer may avoid liability for bad faith by acting in good faith and, consequently, will sustain no excess judgment responsibility. The personal injury plaintiff or assignee will carry the burden of proof in proving to the trier of fact that the insurer exercised bad faith in refusing to settle within the policy limits." 247 Kan. at 319.

In deciding that material issues of fact still exist in this case, we now examine several aspects of the circumstances surrounding the Americold settlement agreement.

### Effect of Breach of Coverage Obligation

While the insurer's good faith obligation to settle is implied, the insurer's coverage obligations are set forth in the policy. When an insurer wrongfully denies coverage, the insurer breaches an express contract provision.

If the insured, exposed to a claim far over the policy limits, receives a reasonable policy limits settlement offer that the insurer rejects because the insurer wrongfully denies coverage (although the insurer is willing to defend subject to a reservation of rights); can the insured, on its own, negotiate a settlement with the claimant that will be binding on the insurer? The answer depends on the facts and may be "yes." The issue was addressed in *Traders & General Ins. Co. v. Rudco Oil & Gas Co.*, 129 F.2d 621 (10th Cir. 1942). After personal injury claimants sought damages from Rudco above policy limits, Traders & General, Rudco's insurer, denied coverage but agreed to defend subject to its reservation of rights.

However, Traders & General filed a declaratory judgment action seeking a no-coverage determination and refused Rudco's request to delay the declaratory judgment action until after trial of the damage claim. Aware of its liability exposure, Rudco negotiated a settlement with the claimants within policy limits. After Traders & General refused to consent, Rudco obtained court approval of the settlement as an agreed judgment, paid its share of the settlement, and sued Traders & General to recover its payment. The trial court, affirmed on appeal, decided that coverage existed, the settlement was reasonable and in good faith, and Traders & General was liable for Rudco's payment. Traders & General was estopped to invoke the policy provision against settlement without its consent. 129 F.2d at 625.

*Rudco* is distinguishable to the extent that plaintiffs here seek to enforce their settlement against NPIC after taking an assignment from Americold and giving Americold a covenant not to execute. Americold did not pay plaintiffs' claims and seek reimbursement from NPIC. Also, unlike *Rudco*, the settlement amount is above policy limits. *Rudco* did not involve an excess insurer. However, both cases involve settlements to which insurers did not consent.

NPIC argues that its lack of consent to Americold's settlement agreement releases it from liability. NPIC attempts to distinguish *AKS v. Southgate Trust Co.*, 844 F. Supp. 650 (D. Kan. 1994), which did not involve an excess judgment, and *First Hays Banshares, Inc. v. Kansas Bankers Surety Co.*, 244 Kan. 576, 582-83, 769 P.2d 1184 (1989), which discussed circumstances in which an insured may enter a settlement agreement with the claimant without losing rights against the insured's policy. *First Hays* concerned first-party loss claims under fidelity bonds, not liability insurance coverage for third-party claims.

In discussing the rule that after an insurer has wrongfully denied coverage, an insured may settle with a third party without prejudicing rights against the insurer, we cited in *First Hays* not only first-party fidelity bond cases but also a third-party liability case, *Shelman v. Western Casualty & Surety Co.*, 1 Kan. App. 2d 44, 562 P.2d 453, *rev. denied* 225 Kan. 845 (1977). *First Hays*, 244 Kan. at 582-83. However, *Shelman* involved the insurer's denial of

coverage and refusal to defend. NPIC has not refused to defend here, although it reserved coverage defenses.

An insured does not lose rights against the insurer by entering into a settlement after the insurer's bad faith denial of coverage and refusal of a reasonable settlement offer within policy limits. NPIC's denial of coverage was wrongful, and if the denial was in bad faith and the policy limits settlement offer was rejected either in bad faith or negligently, then lack of NPIC's consent to the Americold settlement agreement does not preclude its enforcement against NPIC, if the amount is reasonable.

## NPIC's Status as Excess Insurer

At the time National Union tendered its policy limits and NPIC offered to assume the defense (March 10, 1994), NPIC had already made its position clear by Hasty's February 16, 1994, letter. NPIC would not participate in any settlement, although it had the opportunity to settle within policy limits. The NPIC policy provided: "If the Limit of Liability of the Scheduled Underlying Policy(ies) as stated in the Schedule of Underlying Insurance has been exhausted by payments made on behalf of an insured by the primary insurer, this policy will continue in force as Underlying Insurance." The NPIC policy provided further: "We will assume charge of the settlement or defense of any claim or suit against the insured when: a. the Limits of Liability of the Scheduled Underlying Policies have been exhausted by payment of claims." The policy required that the insured "NOT, unless [NPIC agrees], incur any expense or make any payment other than for first aid. If [insured does], those expenses will be at [insured's] own cost." NPIC's consent would be required for any settlement reaching its coverage level.

NPIC contends that *Glenn*, 247 Kan. 296, which did not involve excess coverage, should be distinguished. Americold reached the settlement agreement (March 10, 1994) after NPIC refused to participate in settlement but offered to defend subject to a reservation of rights. NPIC then stood in the primary carrier's shoes. Although the time was limited between the tender of National Union's policy limits and the Americold settlement agreement with plaintiffs (1 day), NPIC had known of a policy limits settlement offer from most

of the plaintiffs since November 1993. Court-ordered settlement discussions had been going on since February 18, 1994. Americold's counsel in his March 9, 1994, letter gave NPIC an opportunity to change its position. NPIC never suggested that it needed more time to reconsider the opportunity to settle within policy limits.

NPIC cites *Emscor Mfg., Inc. v. Alliance Ins. Group*, 879 S.W.2d 894, 909 (Tex. App. 1994), which contains language favorable to NPIC's position. However, *Emscor* is distinguishable. The *Emscor* excess coverage was never triggered because the primary insurer was insolvent. The excess policy carried no obligation to defend. Here, NPIC's duty to defend began upon exhaustion of primary coverage. National Union assumed Americold's defense and later tendered its policy limits during settlement discussions. The primary insurer's insolvency or failure to act did not occur here. For criticism of *Emscor*, see Ashley, § 6:21, pp. 62-63, 66 (1996 Supp.).

## Americold's Failure to Cooperate

Americold owed certain express contractual duties to NPIC, including a duty to cooperate and a duty not to admit any liability or incur any expense unless agreed to by NPIC. NPIC had the right, but not the obligation, to investigate and participate in the defense before the primary insurer's payment of policy limits.

NPIC contends that the settlement agreement shows Americold failed to cooperate in its defense. According to NPIC, Americold admitted liability and kept the terms of the agreement a secret from NPIC.

NPIC claims it was prejudiced by Americold's settlement agreement because NPIC was precluded from defending the case. Although Richmond, defense counsel, thought Americold could raise certain defenses, he recommended settlement when plaintiffs ultimately offered to settle the case within the policy limits. Hasty's February 16, 1994, letter to Americold makes clear that the refusal to offer anything toward settlement was based on NPIC's view that no coverage existed, not on the strength of Americold's defenses in the underlying tort litigation.

NPIC was not obligated to assume the defense until the primary insurance was exhausted. When exhaustion occurred, the litigation had been pending for some 18 months, discovery had taken place, trial on the liability issues was a month away in federal court, and the parties had been involved in court-ordered settlement discussions over the previous 3 weeks. All during this time, NPIC had the right to participate in the investigation and litigation. NPIC's claim of prejudice in being foreclosed from defending Americold, in view of its refusal to offer any settlement amount, is questionable.

Covenant Not to Execute

NPIC also argues that because plaintiffs agreed not to execute against Americold's assets to collect on the consent judgment, the settlement agreement did not impose on Americold a "legal obligation to pay"; thus, NPIC has no obligation.

We have approved of the use of covenants not to execute. *Glenn,* 247 Kan. 296. See *AKS,* 844 F. Supp. at 657 (Federal district court, relying on *Glenn,* held insured's assignment of rights under liability policy and claimant's covenant not to execute did not relieve insurer from liability under policy, provided use of the covenant is reasonable and in good faith.). NPIC attempts to distinguish *Glenn. Glenn* did not involve a denial of coverage by the insurer. The insured in *Glenn* did not assign his rights under the insurance policy in exchange for the covenant not to execute until after a jury verdict was obtained against the insured establishing legal liability. The fact that *Glenn* did not involve a denial of coverage weighs against NPIC's argument. If a covenant not to execute is permissible in a case in which the insurer has defended and provided coverage, but has breached the implied good faith settlement obligation, then it should be no less permissible in a case in which the insurer has breached that obligation by wrongfully denying coverage and rejecting a reasonable policy limits settlement offer. For a discussion of risks remaining as collateral adverse effects after signing a covenant not to execute, see *Consolidated American Ins. v. Mike Soper Marine,* 951 F.2d 186, 190-91 (9th Cir. 1991).

### Americold's Refusal of NPIC's Offer to Defend

What effect should Americold's refusal of NPIC's offer to defend subject to a reservation of rights have on the enforceability of the settlement against NPIC?

Plaintiffs argue that NPIC's reservation of rights was ineffective because it was made orally on March 9, 1994, and the written reservation letter did not follow until sometime later. However, Hasty's February 16, 1994, letter informed Americold of the coverage defenses NPIC was asserting. Lack of a written reservation letter on March 9, 1994, is not controlling, in view of Hasty's February letter.

If NPIC's rejection of a reasonable offer to settle within policy limits was either negligent or in bad faith after its wrongful coverage denial, Americold should be free to negotiate a reasonable, good faith settlement with plaintiffs, even though NPIC offered to defend Americold. We discussed the purpose of an insurer's offer to defend subject to a reservation of rights, in *Bogle v. Conway*, 199 Kan. 707, 713, 433 P.2d 407 (1967) "([The offer to defend and reservation of rights] must be made clear to the insured so that he may make an intelligent decision whether to consent to the assumption of his defense and the control of his lawsuit by the carrier, or to take another course.").

After NPIC wrongfully denied coverage and refused to participate in settlement, it is not surprising that Americold rejected NPIC's offer to defend subject to a reservation of rights. Americold would face the risk of a jury verdict and additional litigation with NPIC over whether Americold had any coverage.

NPIC contends that it did not have to announce its coverage position until assuming the defense, which did not occur until National Union tendered its policy limits. However, NPIC announced its coverage position in Hasty's February 16, 1994, letter, before National Union exhausted its coverage and tendered the defense to NPIC. Hasty's February 16, 1994, letter and NPIC's refusal to participate in settlement support the district court's conclusion that NPIC denied coverage.

NPIC claims that it should not be bound by the terms of the settlement because it preserved its position by offering to defend Americold under a reservation of rights. See *State Farm Fire & Casualty Co. v. Finney*, 244 Kan. 545, Syl. ¶ 1, 770 P.2d 460 (1989) ("Where an insurance company provides an attorney to defend its insured against a pending action while reserving its policy defenses, that attorney's defense of the action does not estop the insurance company from asserting its policy defenses in a subsequent civil proceeding."). NPIC has not been estopped from asserting its coverage defenses; it has done so in this garnishment proceeding.

NPIC's offer to defend under the oral reservation of rights does not cure the wrongful denial of coverage. While NPIC's offer will not, by itself, preclude enforcement of the consent judgments against NPIC, it is relevant to the good faith and negligence issues surrounding NPIC's coverage denial and failure to settle within policy limits. We observe that NPIC's offer to defend included continuation of Armstrong, Teasdale as Americold's counsel at NPIC's expense.

## Reasonableness of Policy Limits Settlement Offer

The reasonableness of the policy limits settlement offer must be viewed through NPIC's eyes at the time the offer was rejected. See *Glenn*, 247 Kan. at 305. NPIC must evaluate the settlement offer without regard to policy limits.

Richmond's litigation status reports to Bissell provided NPIC with damage assessments. Under the policy, NPIC had the right to review Richmond's files. Richmond offered NPIC access to them. In November and December 1993, Richmond forwarded to Bissell settlement packages from Arkwright, IRI, Safeway, Kraft, and Fleming. In his January 17, 1994, damages summary, which was prepared after Arthur Andersen & Co. had been retained to review plaintiffs' damages, Richmond reported to Bissell total claims of $66,045,987.85. Of these, $55,213,875.85 were subrogated insurer claims. Richmond also reported: "Our damages experts at Arthur Andersen & Co. may be able to eliminate as much as $19,093,028.00 in extra expense claims." Richmond mentioned the possibility that if subrogation rights had been waived in the

leases, the subrogated claims could possibly be disposed of. Also, exculpatory clauses in the leases might excuse Americold Services Corporation's negligence. But if gross negligence were found, there would be exposure for the full amount of all claims. In Richmond's February 8, 1994, letter to Bissell, he discussed a counteroffer in the $20-25 million range.

It is possible that plaintiffs would have taken less than the policy limits to settle before March 10, 1994. Richmond had previously written to Bissell that subrogated insurers typically are willing to settle for 50%-74% of the value of their claims. As evidence to show unreasonableness of the settlement amount, NPIC references Richmond's "settlement discount" statement, and his January 17, 1994, damages summary to Bissell. However, NPIC's refusal to offer any amount toward settlement eliminated the opportunity to find out what amount less than the policy limits plaintiffs would have accepted.

NPIC contends that if the *Glenn* test is applicable, there are material issues of fact as to the reasonableness and good faith of the settlement. NPIC also argues expert testimony should have been submitted on many of those issues, citing *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990).

At the time of settlement, the federal court had not yet ruled on summary judgment motions filed by Americold asserting that exculpatory clauses in plaintiffs' leases should have protected Americold Services Corporation (as landlord) from liability for less than gross negligence. As to those motions, Richmond commented in his January 17, 1994 damages summary: "Of course, if Americold is found to be grossly negligent, the exculpatory language in the leases will be wholly and completely ineffective, resulting in a $66,045,987.85 exposure. This possibility cannot be ignored or discounted." Another difficulty with the exculpatory language in the leases was the fact that only Americold Services Corporation, not Americold Corporation, was a party to the leases. Richmond said that Americold would be "faced with disaster" if the judge in the federal cases ruled that the exculpatory clauses in the leases would not apply to Americold Corporation.

NPIC questions how the settlement figure of $58,754,574 was arrived at and further questions why that amount should be considered reasonable if plaintiffs had tendered a settlement offer of $40,750,000. The fact that plaintiffs wanted a premium added to their initial settlement offer for taking on the risk, delay, and expense in pursuing the excess carriers is not surprising. Whether $18 million is a reasonable premium requires further inquiry by the district court on remand.

Richmond described $55 million of the damages as essentially liquidated subrogated insurer claims. Plaintiffs also point out that the total settlement figure was arrived at by applying a percentage discount from the total amount claimed ($66 million), comparable to the discounting procedure used in settling the bailment claims. The discounting procedure was described only vaguely. The total bailment claims were $26,391,759.49, and the settlement paid for those claims was $19,913,940.91.

One of the factors suggested in *Chaussee v. Maryland Casualty Co.*, 60 Wash. App. 504, 512, 803 P.2d 1339 (1991), in evaluating the reasonableness of settlement is the released person's ability to pay. Our adoption of the "judgment rule" in *Farmers Ins. Exchange v. Schropp*, 222 Kan. 612, 624, 567 P.2d 1359 (1977), may place the utility of this factor in doubt. *Schropp* rejected an insurer's contention that a bad faith or negligence claim for failure to settle within policy limits could not be asserted against the insurer when the insured was insolvent. However, in determining whether a settlement above policy limits without the insurer's consent is reasonable, the solvency of the insured is relevant. An impecunious insured may have less incentive to keep the settlement amount reasonable than an insured with collectable assets. The claimant may seek at least partial compensation from an insured with assets, besides an assignment of rights against the insurer. Insolvency of the insured may show a lack of arms-length bargaining.

In the settlement agreement, Americold represented to plaintiffs essentially that it had no assets against which plaintiffs could seek collection, although it could service its existing operating debt. Americold's weak financial status lessened the arms-length bargaining position between Americold and plaintiffs.

NPIC argues that the settlement was collusive because it was kept secret from NPIC and because Americold's 1992 coverage carriers (including National Union, which provided $2 million of primary coverage, and TIG, which provided $15 million of excess coverage) were not exposed for this loss. NPIC also claims that: (1) punitive damages may have been included to inflate the settlement, and (2) Americold's ongoing customer relationships with some plaintiffs and desire to maintain goodwill may show collusion and lack of arms-length bargaining. However, we note the total settlement figure ($58 million) is approximately $8 million less than the total property damage claims ($66 million).

NPIC chose not to be involved in the settlement discussions by refusing to contribute anything toward settlement. Once NPIC denied coverage and offered nothing toward settlement, the relationship with Americold became adversarial. NPIC knew the negotiations were taking place. Under those circumstances, Americold's efforts to keep the final settlement negotiations and agreement confidential from NPIC may or may not raise concerns of collusion.

## District Court Ruling on Reasonableness of Settlement

In ruling that the settlement amount was reasonable, the district court was impressed with the fact that the figure had been arrived at in settlement conferences directed by the federal magistrate according to a formula agreed to by the participating parties. NPIC chose not to participate. The claims were subject to documentation available to NPIC long before the settlement conferences.

Although we understand the respect extended to the federal magistrate, the record does not reflect that the district court made an independent determination as to the reasonableness of the settlement. Instead, the district court seems to have accepted the amount as reasonable because of the circumstances surrounding the settlement negotiations and the nature of the claims. The district court did not address in any depth the strength or weaknesses of plaintiffs' claims and Americold's defenses in the underlying tort litigation. Plaintiffs submitted Niewald's deposition testimony providing his assessment of Americold's defenses. He is an interested witness, however. The district court also apparently did not inde-

pendently evaluate plaintiffs' damage evidence. The only damage evidence offered in the summary judgment motion or included in the record was settlement packages containing documentation of only some of the plaintiffs' claims (Arkwright's and IRI's, and Richmond's damage summaries). Although National Union had retained Arthur Andersen & Co. to review plaintiffs' damage documentation, no evidence of that review was presented—other than in Richmond's summary. A reasonableness of settlement determination is not to be a trial of the underlying litigation, but it should involve more than what plaintiffs presented to the district court.

Under the *Griggs* test adopted in *Glenn*, the plaintiff has the burden of initially presenting a prima facie case to establish the reasonableness of the settlement amount. We have not had occasion to provide guidance on the proof required to satisfy plaintiff's burden. However, the proof requires, at a minimum, enough information for the district court to make an independent evaluation of the reasonableness of the settlement. The test requires that plaintiffs do more than ask the district court to take on faith that the amount of the settlement is reasonable, even if negotiated under the supervision of a federal magistrate. For example, affidavits with documentation could be offered to support the amounts of the claims. In a case of this size and complexity, independent expert testimony evaluating the strengths and weaknesses of the parties' positions could be presented. We give the district court flexibility. For guidance beyond factors suggested by the facts, we recommend those listed in *Chaussee*, 60 Wash. App. at 512, for evaluating reasonableness:

" '[T]he releasing person's damages; the merits of the releasing person's liability theory; the merits of the released person's defense theory; the released person's relative faults; the risks and expenses of continued litigation; the released person's ability to pay; any evidence of bad faith, collusion, or fraud; the extent of the releasing person's investigation and preparation of the case; and the interests of the parties not being released.' " (Quoting *Glover v. Tacoma General Hosp.*, 98 Wash. 2d 708, 717, 658 P.2d 1230 [1983]).

See Ashley, Bad Faith Actions—Liability and Damages § 3:39, pp. 116-18 (1992) for suggested factors in determining whether a settlement is collusive (arms-length bargaining, unrealistic computa-

tion of damages, discounting ["[t]he absence of substantial discounting may indicate collusion"], and secrecy).

Given that plaintiffs' claims are for property damage and most have already been adjusted by the subrogated insurers, substantiation may be straightforward. However, the record on summary judgment does not contain sufficient evidence to establish the reasonableness of the Americold settlement as a matter of law.

### Damages Over Policy Limits

An insured's action for damages for breach of an insurer's implied good faith settlement obligation is contractual in nature. *Aves v. Shah*, 258 Kan. 506, 511-12, 906 P.2d 642 (1995); see *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, Syl. ¶ 2, 652 P.2d 665 (1982).

If a claim for breach of the implied covenant of good faith or breach of any other provision of the insurance policy is contractual in nature, then the term "extracontractual damages" is a misnomer. The damages awarded should place the injured party in the same position as if the breach(es) had not occurred.

The appropriate phrasing of this issue is whether plaintiffs are entitled to recover any amount in excess of NPIC's policy limit of $25 million as breach of contract damages.

Two Court of Appeals cases have considered the issue of an insurer's bad faith in coverage denial: *George R. Winchell, Inc. v. Norris*, 6 Kan. App. 2d 725, 633 P.2d 1174, *rev. denied* 230 Kan. 871 (1981), and *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 15 Kan. App. 2d 153, 804 P.2d 1012, *rev. denied* 248 Kan. 997 (1991).

In *Winchell*, the insurer denied coverage and refused to defend Norris. Winchell, the third-party claimant, obtained a default judgment against Norris over the $10,000 policy limit. In *Winchell's* garnishment against the insurer, coverage was found, but judgment was entered against the insurer only for the policy limit because a substantial question regarding coverage existed and the carrier had acted in good faith in refusing to defend. The *Winchell* court concluded its analysis as follows:

"A showing that bad faith was exercised when the insurer made the initial decision of whether to defend or not is not required. [Citations omitted.] In the latter

situation, a wrongful refusal is enough to constitute breach. If no settlement offer is made, the existence of good or bad faith is irrelevant." 6 Kan. App. 2d at 730.

Under the *Winchell* rationale, bad faith should not be relevant to a breach of the coverage obligation, because, like the duty to defend, coverage is expressed in the policy.

*Snodgrass* also involved denial of coverage and a refusal to defend. The personal injury claimant, Snodgrass, recovered judgment against the insured, Owen, over the policy limits and obtained an assignment of rights from Owen after the insurer, State Farm, denied coverage and refused to defend. During the trial of Snodgrass's action against State Farm, State Farm rejected Snodgrass' policy limits settlement offer. Snodgrass recovered an excess judgment against State Farm. The jury found that State Farm negligently and in bad faith breached the contract. The Court of Appeals affirmed coverage, but did not find substantial competent evidence to support findings that State Farm denied coverage or rejected the settlement offer either in bad faith or negligently. State Farm was not liable for the portion of the judgment over the policy limits.

As to State Farm's denial of coverage, *Snodgrass* stated:

"In the present case, State Farm had legitimate grounds to believe it was justified in denying coverage. An insurance company should not be required to settle a claim when there is a good faith question as to whether there is coverage under its insurance policy. If there is no coverage, there is no fiduciary relationship between the tortfeasor and the insurance company. Given State Farm's good faith claim that its insurance policy did not cover the Camaro, it did not have to attempt to settle the claim, and there was no bad faith prior to judgment." 15 Kan. App. 2d at 166.

The *Snodgrass* court also found that the settlement offer was unreasonable, having been tendered during trial only to show the jury that State Farm had rejected the offer.

Courts in other jurisdictions have struggled with the perplexing problem of settlement rejection based on coverage denial. The struggle has reflected different approaches. See McGuire & McMahon, *Bad Faith, Excess Liability and Extracontractual Damages: Counsel for the Excess Carrier Looks at the Issues*, 72 U. Det. Mercy L. Rev. 49, 62-63 (1994) (comparing a court's holding that an insurer which allows coverage doubts to affect its settlement

decision does so at its peril, see *Johansen v. California State Auto. Assn. Inter-Ins. Bureau*, 15 Cal. 3d 9, 123 Cal. Rptr. 288, 538 P.2d 744 [1975], to those holding that an insurer incurs no liability for bad faith if it insists on litigating a serious coverage issue before agreeing to a policy limits settlement demand, see *Mowry v. Badger State Mut. Cas.*, 129 Wis. 2d 496, 385 N.W.2d 171 [1986]).

*Mowry* reasoned that the California approach

"in effect, renders an insurer strictly liable for any decision not to settle within policy limits, whether or not made in good faith, when a subsequent judgment against the insured exceeds policy limits . . . .

. . . .

"Although we acknowledge the apparent goal of the California approach—to protect the insured from liability for an excess judgment by placing the risk of an erroneous decision not to settle on an insurer—we decline to accept that strict approach for this jurisdiction. Such a policy is unduly oppressive on insurance companies and would force them to settle claims where coverage may be dubious." 129 Wis. 2d at 513-14.

Wisconsin, by statute, provides for a bifurcated trial on issues of coverage and the underlying claim. See Wis. Stat. § 803.04(2)(b) (1993-94). In *Mowry*, the defendant insurer sought a separate coverage trial under the statute, and the parties stipulated to holding the liability and damage issues in abeyance until after the coverage trial. An earlier New York case rejecting strict liability is *Gordon v. Nationwide Mut. Ins. Co.*, 30 N.Y.2d 427, 431, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972), *cert. denied* 410 U.S. 931 (1973).

Although Illinois did not have a bifurcated coverage trial statute similar to Wisconsin's, the *Mowry* rule was adopted in *Stevenson v. State Farm Fire & Cas. Co.*, 257 Ill. App. 3d 179, 184, 628 N.E.2d 810 (1993), *lv. to appeal denied* 155 Ill. 2d 577 (1994) ("We believe that the test used by [the *Mowry*] court is appropriate whatever the procedure might be in deciding the issues.").

The coverage debate between California's strict liability rule and Wisconsin and New York's good faith denial rule is a close one. A logical rationale is advanced for both views. See the dissents in *Mowry*, 129 Wis. 2d at 537, and *Gordon*, 30 N.Y.2d at 441. Commentators differ in analysis of the direction courts are heading on the denial of coverage issue. See McGuire & McMahon, 72 U.

Det. Mercy L. Rev. at 62-63, and Wall, Litigation and Prevention of Insurer Bad Faith § 5.16, p. 222 (2d ed. 1994):

"In recent decisions, courts have shown a significant change in attitude toward a liability insurer's denial of coverage. This tidal shift in attitude has made available an entirely new defense in extracontractual damages actions against liability insurers. . . . Unless the evidence in the extracontractual damages action shows that the insurer denied coverage *without* a fairly or reasonably debatable basis, there can be no extracontractual damages *even if the insurer's denial of coverage was wrong*, it has been held."

In Wisconsin, insurer bad faith is treated as a tort. Wisconsin makes a distinction between insurer bad faith and negligence. *Mowry*, 129 Wis. 2d at 515 ("Bad faith in deciding to litigate rather than settle a claim involves more than a mere finding of negligence on the part of the insurer.").

Kansas does not recognize the tort of bad faith. *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 79, 652 P.2d 665 (1982) (citing *Spencer v. Aetna Life & Casualty Ins. Co.*, 227 Kan 914, 611 P.2d 149 [1980]). We have held that in defending and settling claims against its insured, a liability insurer owes to the insured the duty to act in good faith and without negligence. *Bollinger*, 202 Kan. at 333. The distinction between the "bad faith" and "negligence" standards for insurers has long been blurred. We stated in *Bollinger*, 202 Kan. at 335:

"While the terms 'negligence' and 'bad faith' are not synonymous or interchangeable in a strict legal sense, they share common hues in the insurer's spectrum of duty, and the distinction between the tests is less marked than the terms would suggest. Professor Keeton, in his article *Liability Insurance and Responsibility For Settlement*, 67 Harv. L. Rev. 1136 (1954), emphasizes the lack of distinction by pointing out that even those jurisdictions following the bad faith rule recognize, at least by implication, that the company must, if it fails to settle, defend with ordinary care, and that negligence in investigation which leads to a mistake in failing to settle is also a breach of this duty of ordinary care of defense."

The insurer's duty to act in good faith and without negligence arises under the contract. See *Glenn*, 247 Kan. at 312.

In *Guarantee Abstract*, we said:

"Over the years, courts have increasingly been dissatisfied that 'good faith' in its ordinary sense was too low a test of acceptable conduct of an insurer in performing under an insurance contract. In the effort to raise the standard of conduct required

of an insurer, other tests were utilized such as to act with due care, without negligence, fair dealing, etc. All of these terms are simply statements of the contractual obligation an insurer undertakes under a duty to defend." 232 Kan. at 80.

The duty to act in good faith without negligence also encompasses a liability insurer's coverage decision when used as the reason for rejecting a reasonable settlement offer within policy limits. Although we have previously said that something more than mere error of judgment is necessary to constitute bad faith, *Glenn*, 247 Kan. at 305-06, negligence or a lack of good faith in the coverage investigation or the decision to deny coverage leading to a mistake in failing to settle breaches the insurer's duty.

We endorse the *Snodgrass* rationale that an insurance company should not be required to settle a claim when there is a good faith question as to whether there is coverage under its insurance policy.

## Was NPIC's Denial of Coverage in Bad Faith?

When an insurer rejects a policy limits settlement offer, the question of whether the insurer has breached the implied obligation to settle in good faith will invariably arise. While good or bad faith may be irrelevant to whether an insurer has breached its coverage obligation, it becomes relevant when the insurer bases its rejection of a policy limits settlement offer on coverage denial. Thus, we must decide whether material issues of fact remain concerning NPIC's bad faith in rejecting settlement because of coverage denial.

We approve the *Robinson v. State Farm Fire & Cas. Co.*, 583 So. 2d 1063, 1068 (Fla. Dist. App. 1991), factors suggested for evaluating the circumstances surrounding an insurer's coverage denial, including: (1) whether the insured was able to obtain a reservation of rights; (2) efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way to limit any potential prejudice to the insured; (3) the substance of the coverage dispute or the weight of legal authority on the coverage issue; (4) the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage; and (5) efforts made by the insurer to settle the liability claim in the face of the coverage dispute.

Applying the *Robinson* factors to a review of the record, we conclude material issues of fact remain concerning NPIC's bad faith in rejecting settlement because of coverage denial. We observe:

(1) NPIC offered to defend Americold subject to an oral reservation of rights shortly after National Union tendered its policy limits. NPIC's duty to defend was not triggered until exhaustion of the primary coverage. National Union's coverage position was uncertain until that tender. On remand, the impact, if any, of National Union's delay in establishing its coverage position on NPIC's contractual obligations to Americold will be relevant.

(2) After denying coverage and rejecting the policy limits settlement offer on March 10, 1994, NPIC, in mid-March 1994, filed a declaratory judgment action for a coverage determination in the district court of Johnson County. NPIC believed by early June 1993 that the pollution exclusion applied to preclude coverage, yet chose not to disclose its coverage position until Hasty's February 16, 1994, letter. NPIC claims it was not obligated, as an excess insurer, to disclose its coverage position until National Union's coverage was exhausted. NPIC's actions put Americold in the position of being a month from trial in federal court, facing $66 million in claims with no excess coverage. On the other hand, in view of the settlement and covenant not to execute, Americold may not have been prejudiced by NPIC's conduct.

NPIC had no obligation to assume charge of Americold's defense until National Union's coverage was exhausted. However, it had all the information necessary to determine coverage regarding the absolute pollution exclusion at least by June 1993. Although NPIC may not have had an express contractual obligation to reveal its coverage position before the tender of Americold's defense by National Union, its implied good faith obligation could have required a more prompt disclosure of its coverage position after the initial policy limits settlement offer. In December 1992, Niewald wrote to Lynn, asking Americold's insurers to disclose any facts that would show non-coverage. No response was forthcoming.

In the excess insurance context, the primary carrier (depending on the policy language) will not tender the defense to the excess

carrier until exhaustion of coverage. Often the claim has reached the resolution stage, either through settlement discussions or entry of judgment. If the excess carrier claims it has no duty to investigate or make a coverage determination until tendered the defense, the excess carrier may have to decide coverage instantaneously when a settlement is demanded. The noninvestigating carrier may be unprepared. If the size of the claim is not likely to reach the excess coverage layer, then the excess carrier may not need to disclose coverage. Also, if the insured failed to maintain the primary coverage or the primary insurer defaults, the excess carrier's obligations may never be triggered, and a coverage disclosure could be unnecessary. However, if the size of the claim exceeds both the primary and excess coverage, the facts for a coverage determination are readily available, the primary insurer has assumed the defense, and settlement discussions reaching the excess policy limits are in progress, prompt investigation and disclosure of the excess carrier's coverage position seem advisable.

(3) NPIC's assertion of the pollution exclusion seems questionable in view of the hostile fire amendment in National Union's policy, which was not clearly deleted from the NPIC policy. NPIC's position on the "other insurance" coverage exclusion, claiming that tenant policies provided coverage primary to NPIC's, lacked substance. NPIC never established that any of the alleged negligent acts occurred on the tenants' premises or that the tenants had any responsibility for the fire (although in the underlying tort litigation, Americold was attempting to establish negligence by Return, Inc., if the origin of the fire could have been linked to Return, Inc.'s space).

(4) Although NPIC received copies of tenant leases in early 1992, Hasty did not begin requesting information about tenant insurance policies until January 1994. As an excess insurer, NPIC did not have the same duty to make a prompt investigation and disclosure of its coverage position that a primary insurer would have, at least until it was either called upon to make a settlement decision or the primary coverage was exhausted. NPIC did not reveal its coverage defenses to Americold until February 16, 1994,

although NPIC received the initial policy limits settlement offer by November 1993.

(5) NPIC made no effort to settle.

The factual determination of whether NPIC exercised bad faith in denying coverage remains with the district court on remand. As we said in *Bollinger*: "In the final analysis, the question of liability depends upon the circumstances of the particular case and must be determined by taking into account the various factors present, rather than on the basis of any general statement or definition." 202 Kan. at 338.

## Damages Caused By NPIC's Rejection of Settlement

When NPIC denied coverage and rejected settlement, Americold could have allowed NPIC to defend it. Assuming a bad faith coverage denial and a reasonable settlement offer, if a judgment were entered against Americold over the policy limits at trial, that judgment would clearly be traceable to NPIC's breach of its good faith settlement obligation. After the verdict, Americold could have assigned its rights against NPIC to plaintiffs in exchange for a covenant not to execute. Plaintiffs could have sought to enforce the judgment against NPIC. Instead, Americold avoided the uncertainty of trial and negotiated a settlement that eliminated the possibility Americold would ever have to pay any money, a rational course of action. However, attributing the settlement amount above the policy limits to NPIC's breach, if Americold was never in danger of having to pay, is an open question. Liability up to policy limits would be attributable to NPIC's wrongful denial of coverage. Liability above policy limits is less clearly attributable to NPIC's conduct.

If the settlement amount is reasonable and NPIC's rejection was in bad faith, the settlement could be regarded as the amount needed to restore Americold to the same position it would have been in had NPIC performed its obligations and settled the case for policy limits. At the time the policy limits settlement offer was extended, plaintiffs' claims could have been satisfied by that amount. The settlement amount negotiated later is the amount needed to satisfy the plaintiffs' claims at that time. Why should the

insured be put through a trial, if a reasonable settlement can be negotiated? The insured should not be forced to endure a trial, risk an excess judgment, and then attempt to negotiate a trade of an assignment of rights against the insurer for a covenant not to execute, in order to avoid excess liability. A claimant may be more willing to negotiate with the insured before undertaking the risk and expense of a trial. A reasonable, noncollusive settlement may reflect the value of plaintiffs' claims as accurately as a jury verdict. Based on the above reasoning, the consent judgments could be enforceable against NPIC, if NPIC's denial of coverage and rejection of the policy limits settlement offer were in bad faith and the amount of the consent judgments is reasonable.

## NPIC's Contentions

NPIC argues that if its coverage defenses are valid, any bad faith claim against it is disposed of. We have held against NPIC on the coverage issue. Alternatively, NPIC argues that it at least had a good faith basis for its coverage defenses, which would also negate a finding of bad faith. We have ruled that NPIC's assertion of a good faith denial of coverage is for the district court to decide on remand.

NPIC contends that it owed no duty to disclose its coverage position to Americold until the National Union coverage was exhausted. However, NPIC disclosed its coverage position in response to Americold's request for settlement within policy limits, which occurred before exhaustion of National Union's coverage.

NPIC reasons that it should not be liable for damages over the policy limits when Americold suffered no harm, even assuming NPIC's conduct was in bad faith.

NPIC acknowledges that Richmond advised that the case had a settlement value between $20 and $25 million and was "defensible." NPIC also asserts that it was guided by advice of counsel and quotes Wall, § 5.10, p. 209, which states that evidence that the insurer followed advice of counsel is admissible on the issue of bad faith in settlement.

## Plaintiffs' Arguments

Plaintiffs (1) rely on *Glenn*, 247 Kan. at 310, to counter NPIC's

contention that Americold was not damaged by NPIC's refusal to settle; (2) contend that NPIC's late denial of coverage and refusal to settle were in bad faith and violated the "equal consideration rule" set forth at *Bollinger*, 202 Kan. at 336, and that NPIC further failed to abide by K.S.A. 40-2404(9)(d), (m), and (n), which concern unfair claims settlement practices; and (3) argue that no distinction should exist under Kansas law between the duties owed the insured by a primary insurer and those owed by an excess insurer. According to plaintiffs, K.S.A. 40-2404 is not limited to primary insurers.

We do not find K.S.A. 40-2404 helpful in resolving this case. Although both a primary and an excess insurer owe the insured an implied duty of good faith, the specific contractual duties owed by each are defined in their respective policies.

Plaintiffs list the eight factors cited in *Bollinger*, 202 Kan. at 338, as guidance for the determination of whether NPIC has breached its duty. The *Bollinger* factors relate to an insurer that has admitted coverage and assumed control of the defense and settlement, rather than an insurer that has denied coverage. However, those factors relating to the insurer's coverage decision are relevant. One factor concerns failure of the insurer to properly investigate. Plaintiffs argue this lack of investigation negates NPIC's contention that any good faith coverage dispute existed.

### District Court Ruling

The district court based its finding of bad faith against NPIC in part on NPIC's failure to reveal to Americold until February 1994 Hasty's status as coverage counsel. However, Niewald's correspondence shows that Niewald (Americold's attorney) assumed Hasty was coverage counsel, but believed Hasty was improperly attempting to control the defense of the case.

We question the district judge's analysis of the facts to the extent he believed that NPIC made it appear to Americold that Hasty was retained by NPIC to defend Americold. Niewald's concern with Hasty's conduct was the conflict of interest in Hasty's efforts to obtain information and influence defense strategies (*i.e.*, raising the question of whether tenant liability policies provided any coverage

to Americold), with the obvious motivation of reducing NPIC's coverage exposure. Americold was obligated under a cooperation clause to provide information, even if it could be used as grounds to deny coverage. The fact that Hasty sought information from Americold was not improper. NPIC had authority to participate in Americold's defense, even while National Union defended, although NPIC could not interfere. Neither Richmond nor Niewald had any illusions that Hasty was representing Americold's interests.

The district judge also based his determination that NPIC acted in bad faith on NPIC's failure to investigate or to disclose its coverage position until the eve of settlement discussions and trial, although NPIC recognized early on that it had a duty to promptly disclose its coverage position. The district judge characterized NPIC's actions as evidence of "an intentional course of misconduct to mislead Americold and its counsel which led to judgments being entered versus Americold."

The finding of intentional misconduct is not supported by the record. As an excess insurer, NPIC did not have the same duty to disclose its coverage position as a primary insurer does. Although the circumstances surrounding NPIC's coverage denial raise questions, the district court's finding that NPIC's conduct amounted to bad faith, as a matter of law, is not supported on the summary judgment record. Genuine issues of material fact remain concerning NPIC's bad faith in denying coverage and NPIC's bad faith in rejecting the policy limits settlement offer.

## The Increased Judgment

Because of our reversal and remand on other issues, we need not consider whether the district court improperly increased the amount of the judgment against NPIC after it entered summary judgment against NPIC.

## CONCLUSION

The record is not sufficient for the district court to rule, as a matter of law, that NPIC breached its coverage obligations in bad faith.

The question of NPIC's liability above policy limits will be resolved when the reasonableness of the settlement between plaintiffs and Americold is addressed with other issues on remand. If the district court finds that the denial of coverage was in good faith, NPIC is not bound by the consent judgments but is liable for plaintiffs' covered damages up to the $25 million policy limit. If the district court finds that NPIC's denial of coverage was in bad faith, the refusal to settle for policy limits was in bad faith, and the consent judgments represent a reasonable, good faith settlement, NPIC may be liable under the consent judgments.

The September 20, 1995, and October 12, 1995, orders of the district court are vacated.

Affirmed in part, reversed in part, and remanded.

ABBOTT, J., not participating.

RICHARD W. WAHL, Senior Judge, assigned.